UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

——————————————————————— x

DAVID ADJMI,                                    :
                                                :        14 Civ. 0568 (TPG)
                          Plaintiff,            :
                                                :
           - against -                          :
                                                :
DLT ENTERTAINMENT LTD.,                          :
                                                :
                          Defendant.            :
                                                :
——————————————————————— x
THREE'S COMPANY, A JOINT VENTURE,                :
AND DLT ENTERTAINMENT LIMITED,                   :
                                                :
                          Counter-Claimants,    :
                                                :
           - against -                          :
                                                :
DAVID ADJMI, RATTLESTICK                         :
PRODUCTIONS, INC., RISING PHOENIX                :
REPERTORY, INC., and PIECE BY PIECE              :
PRODUCTIONS, INC.                                :
                                                :
                          Counter-Defendants.   :
——————————————————————— x


## PLAINTIFF/COUNTER-DEFENDANTS'
## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE PLEADINGS


**DAVIS WRIGHT TREMAINE LLP**
**1633 Broadway**
**New York, New York  10019**
**(212) 489-8230**
**Attorneys for Plaintiff/Counter-Defendant**
**David Adjmi**

**FRANKFURT KURNIT KLEIN & SELZ, P.C.**
**488 Madison Avenue, 10th Floor**
**New York, New York 10022**
**(212) 980-0120**
*Attorneys for Counterclaim Defendants Piece by Piece Productions, Inc., Rattlestick*
*Productions, Inc. and Rising Phoenix Repertory, Inc.*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF RELEVANT FACTS ........................................................................... 2

    A.    David Adjmi ....................................................................................... 2

    B.    The Producer Co-Defendants .............................................................. 2

    C.    *Three's Company* ............................................................................. 3

    D.    *3C* ..................................................................................................... 4

    E.    Procedural History ............................................................................. 7

ARGUMENT ..................................................................................................................... 8

    I.    THE STANDARD OF JUDGMENT ................................................... 8

    II.    DLT AND THE JV CANNOT SHOW THAT *3C* INFRINGES THE COPYRIGHT IN *THREE'S COMPANY* ......................................... 10

        A.    The Purpose and Character of Adjmi's Use ............................. 11

        B.    The Nature of *Three's Company* ............................................. 18

        C.    The Substantiality of Adjmi's Use ............................................ 18

        D.    The Effect on the Market for *Three's Company* ..................... 23

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................................................9

*Baraban v. Time Warner, Inc.,*
    No. 99 Civ. 1569, 2000 WL 358375 (S.D.N.Y. Apr. 6, 2000)..............................10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................8

*Bill Graham Archives v. Dorling Kindersley Limited,*
    448 F.3d 605 (2d Cir. 2006)..................................................................................10

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006)..................................................................................10

*Bourne Co. v. Twentieth Century Fox Film Corp.,*
    602 F. Supp. 2d 499 (S.D.N.Y. 2009)............................................................15, 16

*Brownmark Films, LLC v. Partners,*
    682 F.3d 687 (7th Cir. 2012) ........................................................................9, 14, 15

*Burnett v. Twentieth Century Fox Film Corp.,*
    491 F. Supp. 2d 962 (C.D. Cal. 2007) ...................................................................9

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994)...................................................................................... *passim*

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,*
    95 F.3d 959 (10th Cir. 1996) ...............................................................................10

*Cariou v. Prince,*
    714 F.3d 694 (2d Cir. 2013)............................................................................17, 18

*Cariou v. Prince,*
    784 F. Supp. 2d 337 (S.D.N.Y. 2011)...................................................................17

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.,*
    150 F.3d 132 (2d Cir. 1998)............................................................................10, 13

*Chicago Bd. of Educ. v. Substance, Inc.,*
    354 F.3d 624 (7th Cir. 2003) ................................................................................19

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
    886 F.2d 490 (2d Cir. 1989)........................................................................10

*Daly v. Viacom, Inc.*,
    238 F. Supp. 2d 1118 (N.D. Cal. 2002) ......................................................9

*DiFolco v. MSNBC Cable LLC*,
    622 F.3d 104 (2d Cir. 2010)........................................................................9

*Effie Film, LLC v. Murphy*,
    932 F. Supp. 2d 538 (S.D.N.Y. 2013) (Griesa, J.),
    *aff'd*, 2014 WL 1797466 (2d Cir. May 7, 2014)......................................8

*Elsmere Music, Inc. v. National Broad. Co.*,
    482 F. Supp. 741 (S.D.N.Y.), *aff'd*, 623 F.2d 251 (2d Cir. 1980) ........................16, 22, 23, 24

*Eveready Battery Co. v. Adolph Coors Co.*,
    765 F. Supp. 440 (N.D. Ill. 1991) .............................................................22

*Fisher v. Dees*,
    794 F.2d 432 (9th Cir. 1986) ................................................................23, 24

*Hayden v. Paterson*,
    594 F.3d 150 (2d Cir. 2010)........................................................................8

*Karll v. Curtis Publ'g Co.*,
    39 F. Supp. 836 (E.D. Wisc. 1941) ..........................................................18

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998)................................................................ *passim*

*Leibovitz v. Paramount Pictures Corp.*,
    948 F. Supp. 1214 (S.D.N.Y. 1996).............................................15, 16, 23

*Lucasfilm, Ltd. v. MediaMarket Grp., Ltd.*,
    182 F. Supp. 2d 897 (N.D. Cal. 2002) ......................................................16

*Mangiafico v. Blumenthal*,
    471 F.3d 391 (2d Cir. 2006)......................................................................98

*Mattel, Inc. v. Robarb's, Inc.*,
    139 F. Supp. 2d 487 (S.D.N.Y. 2001).........................................................8

*Mattel, Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) .................................................10, 14, 16, 24

*Maxtone-Graham v. Burtchaell*,
    803 F.2d 1253 (2d Cir. 1986)..............................................................11, 24

*Nuñez v. Caribbean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000) ............................................................................18

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992) ...........................................................................18

*Sandoval v. New Line Cinema Corp.*,
    973 F. Supp. 409 (S.D.N.Y. 1997),
    *aff'd on other grounds*, 147 F.3d 215 (2d Cir. 1998) ...............................10

*Scott v. WorldStarHipHop, Inc.*,
    No. 10 Civ. 9538, 2011 WL 5082410 (S.D.N.Y. Oct. 25, 2011) .............................9

*Sony Corp. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).......................................................................................11

*Suntrust Bank v. Houghton Mifflin Co.*,
    268 F.3d 1257 (11th Cir. 2001) ............................................................. *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).........................................................................................9

*Ty, Inc. v. Publications Int'l Ltd.*,
    292 F.3d 512 (7th Cir. 2002) ..........................................................................13

*Video-Cinema Films, Inc. v. Cable News Network, Inc.*,
    No. 98 CIV. 7128, 2001 WL 1518264 (S.D.N.Y. Nov. 28, 2001) .........................10

*Williamson v. Pearson Educ., Inc.*,
    No. 00 CIV. 8240, 2001 WL 1262964 (S.D.N.Y. Oct. 19, 2001) .........................10

*Wright v. Warner Books, Inc.*,
    953 F.2d 731 (2d Cir. 1991)......................................................................10, 11

*Zella v. E.W. Scripps Co.*,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) .............................................................9

**Federal Statutes**

17 U.S.C. § 107...................................................................................... *passim*

17 U.S.C. § 505....................................................................................25, 26

**Rules**

Fed. R. Civ. P. 12...........................................................................1, 8, 9, 26

**Constitutional Provisions**

U.S. Const. amend. I ...............................................................................................10, 14

**Other Authorities**

H.R. Rep. No. 1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659.............................................13

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ..........................13

Plaintiff/Counter-Defendant David Adjmi ("Adjmi") and Counter-Defendants Rattlestick Productions, Inc., Rising Phoenix Repertory, Inc., and Piece By Piece Productions, Inc. (the "Production Companies") submit this memorandum of law in support of their motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

## PRELIMINARY STATEMENT

Acclaimed playwright David Adjmi wrote a play titled *3C* that parodies *Three's Company*, the popular television sitcom of the 1970s.  The play, which was produced for a limited run Off Broadway by the Production Companies, is unmistakably *not* a copy of the original.  Rather, it turns the sunny sitcom world of *Three's Company* inside out and demonstrates how some of the assumptions and stereotypes on which the superficial comedy of *Three's Company* was based were harmful, even toxic, to real people.  *3C* fits squarely into the pantheon of parodies that the Supreme Court and other courts have found protected as fair uses of the underlying works, and therefore not infringing as a matter of law.  However, the owners of the copyright in *Three's Company* nonetheless maintain that Adjmi and the Production Companies needed their permission for the parody.  Their assertion stands unfairly in the way of any further productions of *3C* and the publication of a volume of Adjmi's plays.

The material facts are not in dispute.  A comparison of the script of *3C* to recordings of *Three's Company*, applying the four factors set forth in Section 107 of the Copyright Act, is all that is needed to show that *3C* is a fair use.  The similarities between the two works serve the purpose of parody; the use of elements of *Three's Company* is clearly transformative; and the parody has no cognizable economic impact on the market for *Three's Company*.

Because a fair use is, by definition, non-infringing, Adjmi is entitled to the declaration he seeks that the publication and further production of *3C* would not infringe the copyright in *Three's Company*.  Adjmi and the Production Companies are also entitled to dismissal of the

counterclaims asserted against them (the "Counterclaims") by defendant/counter-claimant DLT Entertainment, Ltd. ("DLT") and counter-claimant Three's Company, a Joint Venture (the "JV"). Adjmi and the Production Companies will seek their reasonable attorneys' fees by separate motion if this Court grants the instant motion.

<u>**STATEMENT OF RELEVANT FACTS**</u>

The undisputed material facts are set forth below.

**A.     David Adjmi**

David Adjmi is an award-winning American playwright.  His works include *Strange Attractors*, *The Evildoers*, *Elective Affinities*, *Marie Antoinette*, *3C*, *Caligula*, and *Stunning*. First Amended Complaint ("FAC") ¶ 11 (Dkt. #6).  His plays have been performed at the Royal Court Theatre in London; the Royal Shakespeare Company at Stratford, England; the Yale Repertory Theatre; the American Repertory Theater; Lincoln Center Theater; and the Soho Repertory Theatre, among others.  *Id.*  Publications including *The New York Times* review his plays when they are produced Off Broadway and by regional theaters.  *See*, *e.g.*, FAC Exhibit B at 17-19, 21-23.

Adjmi graduated from Sarah Lawrence College, the Playwrights Workshop at the University of Iowa, and the Juilliard School's American Playwrights Program.  FAC ¶ 12.  He has received a Guggenheim Fellowship (2011), the Whiting Writers' Award (2010), the inaugural Steinberg Playwright Award (2009), a Bush Artists Fellowship (2008-09), the Kesselring Fellowship for Drama (2008-2009), the Marian Seldes-Garson Kanin Prize (2007), and the Jerome Foundation Fellowship (2006-07), among other honors.  *Id.* ¶ 13.

**B.     The Producer Co-Defendants**

Rattlestick Productions, Inc., Rising Phoenix Repertory, Inc., and Piece By Piece Productions, Inc. are all not-for-profit corporations formed under the laws of the State of New

York.  Counterclaims ¶¶ 5-7; Answer of Counter-Defendants Rattlestick Productions, Inc.,

Rising Phoenix Repertory, Inc., and Piece By Piece Productions, Inc. ("Production Companies

Answer") ¶¶ 5-7.  Their principal places of business are in New York, New York.

Counterclaims ¶¶ 5-7; Production Companies Answer ¶¶ 5-7.  The Production Companies

produced the 2012 production of *3C* in New York; Rattlestick Productions, Inc. owns the theater

where *3C* was produced.  Counterclaims ¶¶ 56-57; Production Companies Answer ¶¶ 56-57.

## C.     *Three's Company*

 *Three's Company* was one of the most popular television shows of its time.  FAC ¶ 17;

Counterclaims ¶ 26 (Dkt # 9).  During its eight-year run from 1977 to 1984, *Three's Company*

was almost continuously among the top ten shows, according to the Nielsen ratings, and it was

the number one show in the United States in the 1978-1979 season.  FAC ¶ 17.  Because of its

immense popularity, *Three's Company* is in many ways emblematic of its era.  *Id.*

 *Three's Company* was a situation comedy that revolved around three single roommates –

Jack, Chrissy, and Janet – who shared an apartment in Santa Monica, California.  *Id.* ¶ 18.

Answer to First Amended Complaint ("Answer") ¶ 18 (Dkt. #9).  Because the landlord frowned

on male-female co-habitation, the roommates pretended that Jack was homosexual, which led to

frequent jokes about his supposed sexual orientation.  FAC ¶ 18.  *Three's Company* was based

on a British sitcom called *Man About the House*, which also featured three roommates, two

female and one male, in which the male roommate pretended he was homosexual to avoid being

evicted by the disapproving landlord.  *Id.* ¶ 19; Answer ¶ 19 (Dkt. #9).

 *Three's Company* was considered daring for its time, in that it featured male and female

characters living together without being related or married.  FAC ¶ 20; Counterclaims ¶¶ 24-25.

Even though the relationships were platonic, the idea of single, opposite-sex adults sharing an

apartment was considered more risqué on television in the late 1970s than it would be today.

FAC ¶ 20; Answer ¶ 20.  In that sense, *Three's Company* reflected aspects of the sexual revolution.  FAC ¶ 20.

The fact that Three's Company even mentioned homosexuality made it a rarity among television shows at the time, and that was another way the show could be viewed as a reflection of the sexual revolution.  FAC ¶ 25; Counterclaims ¶ 24.  However, homosexuality was mocked, and other then-novel issues were likewise played for laughs. FAC ¶ 29; Answer to Counterclaims ¶ 37.  Some critics derided the innuendo-laden humor as lowbrow and immature, and the use of scantily clad actresses made the show an example of the "jiggle" television trend of the time.  FAC ¶¶ 23-24.

**D.**    *3C*

*3C* starts with a basic premise from *Three's Company* and some of its stock characters, but, rather than playing out these situations for light-hearted humor, it focuses on the darkness, pain and violence lurking beneath the shiny exterior surface of the show.  In this way, the play uses the elements of the television show to comment on the ways the show presented and reinforced stereotypes about gender, age, and sexual orientation, and more broadly comments on the times in which the show flourished – when sexual liberation had begun to reshape American society, and dominant cultural forces like television attempted to channel it in commercially profitable directions, while many forms of sexual oppression continued.  FAC ¶ 3.

The similarities manifestly evoke the television show:  a man claims to be gay to fool a strict landlord into letting him live in an apartment platonically with two single women.  FAC ¶ 35. As in *Three's Company*, the lead male character (Brad) is a chef; the blonde female lead (Connie) is ditzy and the daughter of a minister; and the brunette female lead (Linda) is a florist. *Id.*  The landlords (Mr. and Mrs. Wicker) are older and live downstairs.  A male friend of Brad's (Terry) lives upstairs.  The first scene of *3C*, showing how the roommates came together, also

evokes the iconic show: the two "girls" have just thrown a party for their departing roommate; they pour leftover wine back into bottles; a man who attended the party has fallen asleep and remained in their apartment until the next day; they ask the man to take the place of the departing roommate and to pretend he is gay to fool the landlord. *Id.* ¶¶ 35, 55.

Despite some broad parallels in characters and setting, however, the tone, theme and plot of the play are starkly different from the television show. The characters in *3C* have very different problems, and a very different plot unfolds. The winking double entendres and slapstick farce of the sitcom are replaced by crippling anxiety and disturbing sexual violence. For example, while sexual identity is a comedic plot device in *Three's Company*, in *3C* it is a source of shame and anguish, as Brad is, in fact, a closeted gay man who has been rejected by his family. *Id.* ¶ 36. The sexy, "ditzy" blonde roommate is a source of titillation and humor in *Three's Company*, but in *3C*, the similar character struggles with fears of sexual abuse and rape. FAC ¶ 37; FAC Ex. A at 74. Unlike the steady Janet in *Three's Company*, Linda in *3C* is an alcoholic whose low self-esteem prevents her from forming romantic relationships. Answer to Counterclaims ¶ 44; FAC Ex. A at 52-53. Instead of being a harmless "wacky" old lady who complains about not getting enough sex, the landlord's wife in *3C* suffers from suicidal depression and panic attacks. FAC ¶ 39; Answer to Counterclaims ¶ 34. Unlike the crotchety but lovable Mr. Roper in *Three's Company*, Mr. Wicker in *3C* is viciously and openly homophobic, and sexually molests one of the female roommates. FAC ¶ 38. And the upstairs neighbor, Terry, unlike the innocuous playboy Larry in *Three's Company*, subjects Brad to violent homoerotic horseplay while calling him a "faggot." Answer to Counterclaims ¶ 31(n.). In addition, while *Three's Company* was a traditional sitcom in which characters generally delivered their lines sequentially, *3C*'s stage directions call for overlapping dialogue so that the

5

play proceeds at a break-neck pace. *See* FAC Exhibit A at 3 ("A double slash (//) indicates either an overlap or a jump – i.e., no break between the end of one character's speech and the beginning of the following speech."); *passim* (double slashes throughout the text of the script).

The plot of *3C* also travels far afield from the plotlines of *Three's Company*. The television episodes generally revolved around some problem or misunderstanding that was resolved at the end of the half-hour show. *See generally* Exhibit A. The play exposes the hollowness of this portrayal of the times by presenting its own series of surreal, often painful – though sometimes darkly comical – incidents that pointedly offer no resolution: Connie and Terry use cocaine; Brad and Linda play a game called "Faces" that involves changing their facial expressions to match an emotion shouted out by another character; Linda helps Mrs. Wicker with calligraphy for party invitations; and Brad "comes out" with anguish. FAC ¶ 55.[1] In fact, the play ends on a decidedly unresolved note, with the characters treating Brad's coming out as a joke and laughing manically, followed by the stage direction,

> As they recover a disquieting, awful dread creeps into the room.
>
> Silence.
>
> Black.

FAC Ex. A at 97-98.

In 2012, *3C* was produced Off Broadway at the Rattlestick Playwrights Theater in New York City. FAC ¶ 60; Counterclaims ¶ 55. It was immediately recognized as both a pointed commentary and an original dramatic work. One critic described *3C* as an "original if disturbing deconstruction" of *Three's Company*. FAC ¶ 4. Another noted "familiar details and stories unspooling with decidedly dark – even venomous – intensity." *Id.* A third pointed out that *3C*

---

[1] DLT and the JV have alleged that many of the incidents and/or themes in *3C* were "copied" from *Three's Company*. *See, e.g.*, Counterclaims ¶¶ 35-37. Even the most cursory comparison of the two works makes clear how specious these allegations are, beyond the basic similarities noted above. *See* Answer to Counterclaims ¶¶ 35-37.

"reworked the original fluffy good humor [of *Three's Company*] into deep dysthymia and near-suicidal depression, using absurdism and existentialism overdosed with Chekhovian angst."  *Id.*  Playwright Jon Robin Baitz later wrote that *3C* was an "exploration of the essential aloneness of the characters, and the toxic suffering they endure."  FAC Ex. C.

During the New York run of *3C*, the theater received a letter dated June 14, 2012 from lawyers representing DLT.  FAC Exhibit D at 1-3.  The letter insisted that *3C* infringed on DLT's rights under copyright law and demanded that the theater "cease further performances of the Play; provide us with an accounting of all revenues derived from the Play to date; and furnish us with your written assurance that you will fully comply with these demands."  *Id.*  *3C*'s run ended in July 2012, as scheduled.  FAC ¶ 61.

Over the next several months, counsel for Adjmi and DLT exchanged letters outlining their disagreements as to whether *3C* infringed *Three's Company*.  *See* FAC Exhibit D.  There is no dispute that there continues to be a live controversy on this issue, particularly because Adjmi has now received offers to publish *3C* as part of a volume of his plays and to license it for performance, but he cannot pursue those opportunities while DLT continues to assert that a license is needed because *3C* allegedly infringes its rights.  *Id.*; FAC ¶ 67.

## E.   Procedural History

Adjmi filed his declaratory judgment complaint against DLT (Dkt. #1) on January 30, 2014, and filed the First Amended Complaint (Dkt. #6) on February 25, 2014.  On March 24, 2014, DLT filed its answer to the First Amended Complaint, and DLT and the JV filed Counterclaims for copyright infringement against Adjmi and the Production Companies.  Adjmi filed an answer to the counterclaims on April 17, 2014.  (Dkt. # 11).  A copy of the script of *3C* is attached as an exhibit to the Complaint.  (FAC Ex. A).  Copies of recordings of *Three's Company*, which were incorporated by reference in the pleadings, are submitted to the Court as

an exhibit to the Declaration of Camille Calman dated August 25, 2014 (the "Calman

Declaration").  The Production Companies were served on or about June 16, 2014, and answered

the Counterclaims denying liability on July 17, 2014.

## ARGUMENT

## I.

## THE STANDARD OF JUDGMENT

Rule 12 exists to weed out unsound complaints before parties engage in expensive

discovery.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  Under Rule 12(c), the Court

should dismiss an action "where material facts are undisputed and where a judgment on the

merits is possible merely by considering the contents of the pleadings."  *Mattel, Inc. v. Robarb's,

Inc.*, 139 F. Supp. 2d 487, 496 (S.D.N.Y. 2001) (Sweet, J.) (citation omitted).  A motion for

judgment on the pleadings is decided under the same standard as a motion to dismiss under Rule

12(b)(6).  *See Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  The court accepts as true

the allegations of the complaint, drawing all reasonable inferences in the plaintiff's favor, *id.* at

160, but this standard is "turned on its head" in a declaratory judgment case, and both parties'

pleadings are taken as true, with any inconsistencies resolved in favor of the defendant.  *Effie

Film, LLC v. Murphy*, 932 F. Supp. 2d 538, 552-53 (S.D.N.Y. 2013) (Griesa, J.), *aff'd*, 2014 WL

1797466 (2d Cir. May 7, 2014).

Adjmi and the Production Companies can therefore prevail on this motion by establishing

that they would be entitled to judgment in any copyright infringement action brought against

them by DLT and the JV.  *Id*. at 553.  The court may naturally consider "documents incorporated

into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs,

Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  Even when a document is not

incorporated by reference, "the court may nevertheless consider it where the complaint 'relies

8

heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  Here, both parties' pleadings rely upon *Three's Company* (*see*, *e.g.*, FAC ¶¶ 21-26, 29-32; Counterclaims ¶¶ 14-19, 31a-o, 34-37) and quote from its episodes (FAC ¶¶ 21-22; Counterclaims ¶¶ 30h, 30m, 36).[2]  The content of *Three's Company* is integral to the FAC and to the counterclaims.

The Court may therefore examine both the *3C* script (attached to the FAC as Exhibit A) and any relevant parts of the series *Three's Company* (attached to the Calman Decl. as Exhibit A) to decide this motion.  Motions to dismiss on fair use grounds are routinely resolved (and granted) in this way.  *See*, *e.g.*, *Scott v. WorldStarHipHop, Inc.*, No. 10 Civ. 9538, 2011 WL 5082410 (S.D.N.Y. Oct. 25, 2011); *Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 966 (C.D. Cal. 2007); *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1131-32 (C.D. Cal. 2007); *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1121-22 (N.D. Cal. 2002).[3]  As in *Brownmark Films, LLC v. Partners*, 682 F.3d 687, 690 (7th Cir. 2012), "the only two pieces of evidence needed to decide the question of fair use in this case are" the original work and the parody.  Courts in this Circuit do not hesitate to dismiss claims where the alleged copying is a fair use and no material issues of fact remain to be tried.[4]  This is just such a case.

---

[2] It is not necessary for the Court to review all nine seasons of *Three's Company* in deciding this motion.  Only nine episodes of *Three's Company* are cited and/or quoted in the parties' pleadings:  The First Amended Complaint cites Season 1, Episode 4 and Season 4, Episode 9; the Counterclaims cite to Season 1, Episode 1; Season 1, Episode 2; Season 2, Episode 3; Season 2, Episode 6; and Season 2, Episode 22.  Adjmi's Answer to the Counterclaims cites Season 2, Episode 3 and Season 2, Episode 22 (both of which were cited in the Counterclaims).

[3] Alternatively, it is within the Court's discretion to convert a Rule 12(c) motion into a motion for summary judgment where it is satisfied that "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  As the discussion below establishes, there is no genuine issue as to any material fact here.  *3C* is patently protected by the defense of fair use.

[4] *See*, *e.g.*, *Blanch v. Koons*, 467 F.3d 244, 249-50 (2d Cir. 2006); *Bill Graham Archives v. Dorling Kindersley Limited*, 448 F.3d 605 (2d Cir. 2006); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998); *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991); *Video-Cinema Films, Inc. v. Cable News Network, Inc.*, No. 98 CIV. 7128, 2001 WL

9

## II.

## DLT AND THE JV CANNOT SHOW THAT
## *3C* INFRINGES THE COPYRIGHT IN *THREE'S COMPANY*

*3C*'s use of plot and character elements drawn from *Three's Company* to criticize and parody the television show is a quintessential fair use that is not actionable under copyright law. The Supreme Court has explained that a parody is an "artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule," and "use[s] some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994). "[P]arody is a form of social and literary criticism" that "has socially significant value as free speech under the First Amendment." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 801 (9th Cir. 2003) (internal quotation marks and citation omitted). Because parody implicates "core" constitutional concerns, *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 972 (10th Cir. 1996), courts uniformly recognize "'the broad scope permitted parody in First Amendment law.'" *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 493 (2d Cir. 1989) (citation omitted).

These principles are reflected in Section 107 of the Copyright Act, which codifies the fair use doctrine, creating "a privilege … to use the copyrighted material in a reasonable manner without [the owner's] consent." *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1255 (2d Cir. 1986) (citation omitted) (emphasis added). Section 107 balances "the interests of authors … in the control and exploitation of their [works] on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand[.]" *Sony Corp. v. Universal*

---

1518264 (S.D.N.Y. Nov. 28, 2001) (Jones, J.); *Baraban v. Time Warner, Inc.*, No. 99 Civ. 1569, 2000 WL 358375 (S.D.N.Y. Apr. 6, 2000) (Martin, J.); *Williamson v. Pearson Educ., Inc.*, No. 00 CIV. 8240, 2001 WL 1262964 (S.D.N.Y. Oct. 19, 2001) (Schwartz, J.); *Sandoval v. New Line Cinema Corp.*, 973 F. Supp. 409, 411-12 (S.D.N.Y. 1997) (Stein, J.), *aff'd on other grounds*, 147 F.3d 215 (2d Cir. 1998).

10

*City Studios, Inc.*, 464 U.S. 417, 429 (1984).  In the preamble to Section 107, Congress identified

several illustrative fair uses, including "*criticism* [and] *comment.*"[5]  To facilitate the balancing

process, Congress set forth four, non-exclusive factors to be considered in determining whether a

particular use of a copyrighted work is a fair use:

> (1)    the purpose and character of the use, including whether
>        such use is of a commercial nature or is for nonprofit
>        educational purposes;
>
> (2)    the nature of the copyrighted work;
>
> (3)    the amount and substantiality of the portion used in relation
>        to the copyrighted work as a whole; and
>
> (4)    the effect of the use upon the potential market for or value
>        of the copyrighted work.

17 U.S.C. § 107(1)-(4).  The four factors are considered together, rather than "treated in

isolation."  *Campbell*, 510 U.S. at 578.  Because no single factor is dispositive, the moving party

"need not 'shut out' her opponent on the four factor tally to prevail."  *Wright*, 953 F.2d at 740.

Here, each of the factors weighs decidedly in favor of a finding that Adjmi's parody of

*Three's Company* constitutes a fair use.

## A.    The Purpose and Character of Adjmi's Use

*3C* overtly uses elements of *Three's Company* for the purpose of social, cultural, and

artistic commentary.  It twists the premise and stock characters of an iconic and enormously

popular and influential TV series in a surreal and often disturbing manner to emphasize the

repression, anxiety, and even violence that the sitcom and popular cultural products like it hid.

To make these points, Adjmi altered the characters and invented his own plot for them.  The

purpose of using elements of the show is clear:  to parody *Three's Company* and, in doing so, to

expose and criticize the toxic assumptions about sexuality, gender, and age at the heart of one of

---

[5] Parody is a classic form of criticism and comment.  *See Campbell*, 510 U.S. at 579.

the most popular television shows of the 1970s, a program that is still shown on cable channels today.  FAC ¶ 28.  Consequently, the first fair use factor, the "purpose and character" of the use, overwhelmingly weighs in favor of a finding of fair use.

The Eleventh Circuit illustrated the application of the first fair-use factor when "a parodic character may reasonably be perceived" in the allegedly infringing work, in its decision reversing a preliminary injunction and finding that the publisher of *Gone With the Wind* had not established a likelihood of success on the merits of its copyright claim involving the novel *The Wind Done Gone*.  *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001) (quoting *Campbell*, 510 U.S. at 582).  The court held that the defendant was "entitled to a fair use defense" because *The Wind Done Gone* was a parody of *Gone With the Wind* rather than an unauthorized sequel to it.  *Id.* at 1269-71, 1276.  Elucidating the Supreme Court's definition of parody in *Campbell*, the court concluded that a broad view of parody was necessary:

> On the one hand, the Court suggests that the aim of parody is "comic effect or ridicule," but it then proceeds to discuss parody more expansively in terms of its "commentary" on the original.  In light of the admonition in *Campbell* that courts should not judge the quality of the work or the success of the attempted humor in discerning its parodic character, we choose to take the broader view.  For purposes of our fair-use analysis, *we will treat a work as a parody if its aim is to comment upon or criticize a prior work by appropriating elements of the original in creating a new artistic, as opposed to scholarly or journalistic, work*.  Under this definition, the parodic character of *TWDG* is clear.

*Id.* at 1268-69 (citations omitted) (emphasis added).  The "parodic character" of *3C* is equally clear.  *3C* is a new artistic work that appropriates elements of *Three's Company* specifically to comment upon and criticize *Three's Company*.  The rote denials of DLT and JV that *3C* is a parody cannot obscure the nature of the play, which is plain from any look at the script.  Its aim in referring to *Three's Company* could not be clearer.  Counterclaims ¶¶ 22, 39-43, 45-46, 48.

12

The "central purpose" of the first-factor analysis is to determine "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character" – whether the use is "transformative." *Campbell*, 510 U.S. at 579 (internal quotation marks and citations omitted).  Parody "has an obvious claim to transformative value" and "may claim fair use under § 107" because it "adds something new, with a further purpose or different character, altering the [copyrighted material] with new expression, meaning or message."  *Id.* (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)).[6]  As the Second Circuit has explained, if whatever is copied "is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings[,] this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Castle Rock Entm't*, 150 F.3d at 142 (quoting Leval, 103 Harv. L. Rev. at 1111).  That is precisely what *3C* has done with elements of *Three's Company*:  added a great deal that is new and transformed elements of the sitcom in an original new work for the purpose of social and cultural criticism.

In *Campbell*, the rap group 2 Live Crew incorporated elements of Roy Orbison's classic song "Pretty Woman" – including music and lyrics – into a vulgar and highly sexual song with the same title.  510 U.S. at 573, 582.  The Supreme Court found that the stark contrast between the 2 Live Crew song and the original "can be taken as a comment on the naiveté of the original of an earlier day, as a rejection of its sentiment that ignores the ugliness of street life and the debasement that it signifies." *Id.* at 583.  For that reason, the Court suggested that the first fair-use factor weighed in 2 Live Crew's favor. *Id.* at 583-84.

---

[6] *See also Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 518 (7th Cir. 2002) (identifying "parody" as protected fair use); H.R. Rep. No. 1476, at 65 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5678-79 (identifying "use in a parody" as an activity that qualifies as fair use under Copyright Act).

13

In cases since *Campbell*, courts have held consistently that the first factor strongly favors parodists.  In *Walking Mountain*, for example, Mattel brought copyright and trademark infringement claims against an artist who created and sold photographs of Mattel's iconic Barbie dolls in incongruous, sexually charged situations, in works that tacitly "critiqu[ed] the objectification of women" and "lambast[ed] the conventional beauty myth and the societal acceptance of women as objects."  353 F.3d at 796.  Affirming that the first factor favored fair use, the court observed that Mattel had created associations of "beauty, wealth, and glamour" with Barbie's image, and that the artist's work "turns this image on its head" by portraying Barbie in bizarre and fraught scenarios.  *Id.* at 802.  By putting Barbie in this new context, the court held that the artist "transformed Barbie's meaning" by "creat[ing] the sort of social criticism and parodic speech protected by the First Amendment and promoted by the Copyright Act."  *Id*. at 802-03.  Adjmi has done something similar, but even more transformative, with the *Three's Company* characters evoked in *3C*.

Similarly, in *Brownmark Films*, the animated television series *South Park* created a parody of a video by the singer Samwell titled "What What (In the Butt)"  that "went viral" on the Internet.  The Seventh Circuit found that the *South Park* video was very similar, "using the same angles, framing, dance moves, and visual elements."  682 F.3d at 689.  However, the parody version inserted one of the characters in the animated series, a naïve nine-year-old boy named Butters, unknowingly singing a song about anal sex while dressed as a teddy bear, an astronaut, and a daisy.  That incongruous addition was enough for the court to conclude that "this kind of parodic use has obvious transformative value" because the purpose was to comment on the phenomenon of the "viral video."  *Id.* at 693.

14

Applying the same analysis, the use of the Disney song "When You Wish Upon A Star"

in a parody song titled "I Need A Jew" in the animated television series *Family Guy* was held

protected as a fair use. *Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F. Supp. 2d 499,

506-09 (S.D.N.Y. 2009). The court explained:

> Defendants' use of "When You Wish Upon a Star" calls to mind a
> warm and fuzzy view of the world that is ultimately nonsense;
> wishing upon a star does not, in fact, makes one's dreams come
> true. By pairing Peter's "positive," though racist, stereotypes of
> Jewish people with that fairy tale world-view, "I Need A Jew"
> comments both on the original work's fantasy of Stardust and
> magic, as well as Peter's fantasy of the "superiority" of Jews. The
> song can be "reasonably perceived" to be commenting that any
> categorical view of a race of people is childish and simplistic, just
> like wishing upon a star.

*Id.* at 506-07, 509. Like the episode of *Family Guy*, and even more pointedly, *3C* calls to mind

the warm and fuzzy and frivolous view of the world presented in *Three's Company* to show that

it was nonsense, and, what's more, harmful nonsense. In words that apply with particular force

here, the *Bourne* court observed that "*the owner of the rights to a well-known work must expect,*

*or at least tolerate, a parodist's deflating ridicule.*" *Id.* at 511 (internal quotation marks and

citation omitted) (emphasis added).

The court made the same point in *Leibovitz v. Paramount Pictures Corp.*, where the

parody was an advertisement rather than a full-length literary work like *3C*. A celebrated

photographer sued Paramount Pictures for copyright infringement after it released an ad for its

movie *The Naked Gun 33 1/3* that featured the face of the actor Leslie Nielsen superimposed on

the completely unrelated famous *Vanity Fair* cover photograph of a pregnant Demi Moore. 948

F. Supp. 1214, 1222 (S.D.N.Y. 1996). The court explained that, "[l]ike all parodies, [the ad]

relies for its comic effect on the contrast between the original – a serious portrayal of a beautiful

woman taking great pride in the majesty of her pregnant body – and the new work – a ridiculous

image of a smirking, foolish-looking pregnant man.  It thus fits squarely within the definition of parody[.]"  *Id.*  The Second Circuit affirmed, finding the ad to be a transformative parody because it "comment[ed], through ridicule, on what a viewer might reasonably think is the undue self-importance conveyed by the subject of the Leibovitz photograph."  *Leibovitz*, 137 F.3d at 114-15.  The "joinder of reference and ridicule" in the ad – the "smirking face of Nielsen [that] contrasts so strikingly with the serious expression on the face of Moore" – served as "a sufficient 'comment' to tip the first factor in [the] parodist's favor."  *Id.*[7]

Here, the anguish experienced by *3C*'s characters as they try to fit themselves into a sitcom world that has no place for them contrasts sharply with the cheerful, sunny characters of *Three's Company*, whose problems are always solved by the end of a half-hour episode. *Compare* FAC Exhibit A *with* Calman Declaration Ex. A.  This contrast – what the *Walking Mountain* court called "turning the [plaintiff's] image on its head," 353 F.3d at 802 – underscores *3C*'s parodic nature.  As in *Bourne*, the worldview portrayed in *Three's Company* is shown to be a fantasy, by being punctured by Adjmi's artistic commentary upon it.  Adjmi's commentary on *Three's Company* in *3C* is far more elaborate and direct than 2 Live Crew's use of a Roy Orbison song, or *South Park*'s use of Samwell's video, or *Family Guy*'s use of "When You Wish Upon a Star."

DLT and the JV suggest that Adjmi has described *3C* as parody only belatedly and is therefore less entitled to assert the defense of fair use.  Counterclaims ¶¶ 38-39.  Even accepting

---

[7] *See also, e.g.*, *Elsmere Music, Inc. v. National Broad. Co.*, 482 F. Supp. 741, 743-44 (S.D.N.Y.) (Goettel, J.) (finding that first factor favored fair use where *Saturday Night Live* used elements of "I Love New York" ad jingle in "I Love Sodom" parody in which promoters of biblical city of Sodom sought to counter poor public image; *SNL*'s "song was as much a parody of the song, 'I Love New York,' a catchy, upbeat tune intended to alter a potential tourist's perceptions of New York, as it was of the overall 'I Love New York' advertising campaign"), *aff'd*, 623 F.2d 251 (2d Cir. 1980); *Lucasfilm, Ltd. v. MediaMarket Grp., Ltd.*, 182 F. Supp. 2d 897, 901 (N.D. Cal. 2002) (pornographic spoof of *Star Wars* films; was vulgar but protected as a "parody of Star Wars, in that it is a literary or artistic work that broadly mimics an author's characteristic style and holds it up to ridicule").

the factual allegation as true for the limited purpose of this motion,[8] it would not detract from the transformative nature of the use.  As the Second Circuit's decision in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), makes clear, an artist's description of his work does not determine whether the work is transformative.  In that case, "appropriation artist" Richard Prince testified at his deposition that he "'do[es]n't really have a message,' that he was 'not trying to create anything with a new meaning or a new message' and that he 'do[es]n't have any ... interest in [Cariou's] original intent.'"  *Id.* at 707 (quoting *Cariou v. Prince*, 784 F. Supp. 2d 337, 349 (S.D.N.Y. 2011)).  The District Court granted summary judgment for Cariou, basing its holding that Prince's work was not transformative in large part on this testimony.  The Second Circuit disagreed, placing the emphasis where it belongs: on the works themselves, not artists' statements about them.

> On appeal, Cariou argues that we must hold Prince to his testimony and that we are not to consider how Prince's works may reasonably be perceived unless Prince claims that they were satire or parody.  No such rule exists, and we do not analyze satire or parody differently from any other transformative use.

> It is not surprising that, when transformative use is at issue, the alleged infringer would go to great lengths to explain and defend his use as transformative.  Prince did not do so here.  However, the fact that Prince did not provide those sorts of explanations in his deposition — which might have lent strong support to his defense — is not dispositive.  What is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work.

---

[8] In fact, DLT and the JV's allegations are directly contradicted by the newspaper article on which they base their contention.  The Counterclaims state that Adjmi "sought advice 'from my agents at CAA and my producers, some of whom doubted that the play would meet the legal standards of parody'" "[w]hen Adjmi started developing the script."  Counterclaims ¶ 39 (quoting Patrick Healy, *If Three Constitutes Company, Add Lawyers to Make it a Crowd*, New York Times (July 17, 2012) (available at http://www.nytimes.com/2012/07/18/theater/threes-company-lawyers-object-to-the-play-3c.html)).  In fact, the Article makes clear that Adjmi "sought [this] advice" *after* he had received cease-and-desist letters from DLT.  Answer to Counterclaims ¶ 39.  His parodic intent was plain from the start, as the script shows on its face.

DWT 24695097v1 0200664-000001

*Id.*  The parodic nature of *3C* is obvious on its face.  To any "reasonable observer," Adjmi unmistakably transformed the meaning of the elements of *Three's Company* that are referred to in *3C*, and the first factor therefore weighs heavily in favor of fair use.

**B.     The Nature of *Three's Company***

The second factor in the fair use inquiry is the "nature of the copyrighted work" – whether a work is creative or factual, and whether the work is published or not.  17 U.S.C. § 107(2); *Campbell*, 510 U.S. at 586.  As the Supreme Court pointed out in *Campbell*, this factor is rarely "likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works."  *Id.*

Because *3C* parodies a work that was published, and indeed broadcast widely and became iconic, the second factor also favors a finding of fair use.

**C.     The Substantiality of Adjmi's Use**

For the third factor – the amount and substantiality of the portion used in relation to the copyrighted work as a whole – the inquiry is "a flexible one."  *Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000).  Because this factor "harken[s] back to the first of the statutory factors, … the extent of permissible copying varies with the purpose and character of the use."  *Campbell*, 510 U.S. at 586-87.  *See also Karll v. Curtis Publ'g Co.*, 39 F. Supp. 836, 837-38 (E.D. Wisc. 1941) (where a defendant's work "differs greatly in nature, scope, and purpose from the original, a larger liberty in making quotations and extracts will be permitted").

In parody cases, courts "have consistently held that a parody entitles its creator under the fair use doctrine to more extensive use of the copied work than is ordinarily allowed[.]"  *Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992).  The reason for this is clear:  "[p]arody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through

18

distorted imitation.  Its art lies in the tension between a known original and its parodic twin."
*Campbell*, 510 U.S. at 588.  Thus, the Seventh Circuit has recognized that "a parodist has to be
able to quote, *sometimes very extensively*, from the parodied work in order to make the criticism
of it that is implicit in parodying it comprehensible."  *Chicago Bd. of Educ. v. Substance, Inc.*,
354 F.3d 624, 629 (7th Cir. 2003) (emphasis added).  "[R]oom must be allowed for judgment,
and judges must not police criticism with a heavy hand."  *Id.*  The Supreme Court has established
that even the "heart" of the work may be copied.  *Campbell*, 510 U.S. at 588 ("Copying does not
become excessive in relation to parodic purpose merely because the portion taken was the
original's heart.").  Even if a parodist uses a substantial amount of the plaintiff's work, the third
factor will have "little, if any, weight against fair use so long as the first and fourth factors favor
the parodist" – as they do here.  *Leibovitz*, 137 F.3d at 116.

The similarities between the characters and settings in *3C* and *Three's Company* are
typical of parodies.  In that respect, this case strongly resembles *Suntrust Bank*, 268 F.3d 1257.
There, author Alice Randall's novel *The Wind Done Gone* made substantial use of Margaret
Mitchell's *Gone With the Wind*, "appropriat[ing] the characters, plot and major scenes" but
telling the story from the point of view of a slave.  *Id.* at 1259.  Randall's characters had some
new names – for example, Scarlett O'Hara was "Other," Rhett Butler was "R.B.," Ashley Wilkes
was "Dreamy Gentleman," Melanie Wilkes was "Mealy Mouth," Prissy was "Miss Priss," Pork
was "Garlic," and Aunt Pittypat was "Aunt Pattypit," *id.* at 1267, but their personalities and
characteristics were recognizably those of the originals – with twists that highlighted the racist
assumptions underlying Mitchell's original.  For instance, the character "Pork" in *Gone With the
Wind* was a loyal, obedient slave, but, in *The Wind Done Gone*, "Garlic" subverts the master-
slave relationship by controlling his master.  Recognizable place names from *Gone With the*

19

*Wind* were also rechristened, but only slightly; Tara became "Tata," Twelve Oaks Plantation became "Twelve Slaves Strong as Trees."   *Id.*   And, in fact, as the court acknowledged, several details and incidents from *Gone With The Wind* were "retold or alluded to without serving any apparent parodic purpose," such as the fact that the Tarleton Twins characters from *Gone With the Wind* "had red hair and were killed at Gettysburg."  *Id.* at 1273.

The Eleventh Circuit found that the new novel made substantial use of elements of the original, including characters, settings, and plot twists.  *Id.* at 1267.  However, in applying the four fair use factors, the court found the parodic nature of the new novel to be clear:  "*TWDG* is … a specific criticism of and rejoinder to the depiction of slavery and the relationships between blacks and whites in *GWTW*."   *Id.* at 1269.  The new novel's use of elements from the original was transformative, for the purpose of commentary:  "Randall has fully employed those conscripted elements from *GWTW* to make war against it."  *Id.* at 1271.

Just as *The Wind Done Gone* presented new insights into the racist assumptions underlying *Gone With the Wind* by retelling the same story from a different point of view, so *3C* presents new insights by showing the sexist and homophobic assumptions underlying the original *Three's Company*.  The character of Brad – recognizably based on *Three's Company*'s Jack Tripper, just as "Other" was recognizably based on Scarlett O'Hara – is not a carefree young California bachelor, living with two beautiful women and having to pretend that he is gay to fool his landlord; rather, Brad is an anguished, self-loathing real gay man in love with his best friend, who cannot reveal the truth about his sexuality to his friends, his family, his landlords, or the man he loves, who joins in cruel anti-gay jokes, and whose unresolved feelings make him "want to die."  FAC Exhibit A, at 70, 85-86.

Similarly, the character of Chrissy, Jack's attractive, innocent, and ditzy roommate in *Three's Company*, has been transformed into Connie, who uses cocaine and has had trouble with romance after an apparently abusive relationship with a boyfriend.  *Id.* at 74.  Janet, the perky and sensible roommate in *Three's Company*, has been transformed into Linda, an alcoholic who downs large drinks throughout the play and is so crippled by poor self-esteem that she refuses to go on a date with a man she likes and allows the landlord to molest her.  *Id.* at 15, 41, 52, 53, 58, 87.  Mrs. Roper, a wisecracking landlady whose sexual frustration is a source of comedy in *Three's Company*, is transformed into Mrs. Wicker, a woman who has been diagnosed with anxiety but refuses to take her pills, and who wants to kill herself.  *Id.* at 33, 39.  Mr. Roper, transformed into Mr. Wicker, is more than just a landlord and reluctant handyman who would be shocked by mixed-gender cohabitation; now he is virulently homophobic, subjecting Brad to a series of truly ugly and offensive jokes, and physically and sexually aggressive.  *Id.* at 40-41, 85.

The transformations are obvious, as in *The Wind Done Gone*, and they likewise serve the purpose of creating new insights into the original work. *The Wind Done Gone* ripped aside the façade of *Gone With the Wind* to show that the original was not merely a well-known (and allegedly harmless) piece of historical fiction, but was based on destructive racist assumptions that resulted in the African-American characters being depicted as either foolish and incompetent (Pork, Prissy) or thoroughly content with a subservient role in the system of slavery (Mammy). No one who has read *The Wind Done Gone* can think of *Gone With the Wind* in the same way again – not because it infringed the copyright of the original, but because its incisive parody exposes damaging racist assumptions that underlie the original and still exist in our society. Similarly, *3C* rips aside the façade of *Three's Company* to show that the original is not merely a beloved (and allegedly harmless) piece of 1970s pop culture, but was based on destructive

21

assumptions about gender and sexuality that still exist in our society.  No one who has seen *3C* will ever again look the same way at *Three's Company* and its contrast of "fairies" with "normal" men; its leering use of its female characters' bodies; and its assumption that middle-aged married women are dried-up, sexually unattractive figures of fun.

The law permits liberal use of elements of the original work in parodies.  In *Elsmere Music*, for example, the district court acknowledged that *Saturday Night Live* used the "heart" of the "I Love New York" jingle in its parody sketch, but nonetheless found that this factor favored fair use because "[a]n author is entitled to more extensive use of another's copyrighted work in creating a parody than in creating other fictional or dramatic works."  482 F. Supp. at 745.  The Second Circuit agreed, explaining that "[a] parody is entitled at least to 'conjure up' the original. Even more extensive use would still be fair use, provided the parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary."  623 F.2d at 253 n.1.  In *Suntrust Bank*, the court went even further, acknowledging that "descriptions of characters and the minor details of their histories and interactions that arguably are not essential to the parodic purpose of the work recur throughout," but that *The Wind Done Gone* was nevertheless entitled to a fair use defense because parodists are not required to "take the bare minimum amount of copyright material necessary to conjure up the original work."  268 F.3d at 1273.  *Accord Eveready Battery Co. v. Adolph Coors Co.*, 765 F. Supp. 440, 447-48 (N.D. Ill. 1991) (holding that a beer ad featuring Leslie Nielsen, this time as the Energizer Bunny, was protected as a fair use).

*3C* falls well within these very liberal bounds.  It refers to *Three's Company* as "a known element of modern culture" and "contribute[s]" a great deal of new material "for humorous effect or commentary."  *Elsmere Music*, 623 F.2d at 253 n.1.  The approximately two-hour *3C* does not

copy dialogue from *Three's Company*.  (Any incidental overlaps in wording are *de minimis* and not expressive.)  It uses a title that refers to the original work and similar characters to identify the work that is being parodied and make its own points about the subject.  The titles of parodies often refer to the works being parodied: *The Wind Done Gone* refers to *Gone with the Wind* (*Suntrust Bank*, 268 F.3d 1257); *"*When Sunny Sniffs Glue*"* refers to "When Sunny Gets Blue" (*Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986)); "Pretty Woman" refers to "Oh, Pretty Woman" (*Campbell,* 510 U.S. at 580); "I Love Sodom" refers to "I Love New York" (*Elsmere Music*, 482 F. Supp. 741).  Just as the court in *Leibovitz* noted that, "without reference to the [Demi] Moore photograph, the Nielsen ad [depicting a pregnant Nielsen] simply is not very funny" (948 F. Supp. at 1222), Adjmi's parody exists to comment on *Three's Company* and must use elements of the TV show to do so.  Using its own language and its own plot, it adds many other elements that do not appear in *Three's Company* to highlight the problems of real people that *Three's Company* ignored and thereby helped mask, including illegal drug use, alcoholism, crippling anxiety, and struggles with sexual identity.  FAC Ex. A.  Because Adjmi used elements of *Three's Company* for purposes of parody and criticism, and did not use too much of the original work by any court's measure, the third factor also favors fair use.

**D.    The Effect on the Market for *Three's Company***

The fourth factor – the "effect of the use upon the potential market for or value of the copyrighted work" – generally weighs in favor of a parodist and certainly does here.  As the Supreme Court has noted, "there is no protectable derivative market for criticism.  [T]he unlikelihood that creators of imaginative works will license … lampoons of their own productions removes such uses from the very notion of a potential licensing market."  *Campbell*, 510 U.S. at 592.  This ruling is vital to free expression; if only licensed parodies were permitted,

23

a copyright owner effectively could prevent parodies of his work.  *See*, *e.g.*, *Walking Mountain*, 353 F.3d at 806 ("No doubt, Mattel would be less likely to grant a license to an artist that intends to create art that criticizes and reflects negatively on Barbie's image.  It is not in the public's interest to allow Mattel complete control over the kinds of artistic works that use Barbie as a reference for criticism and comment.").[9]  Ultimately, "the economic effect of a parody with which [a court is] concerned is not its potential to destroy or diminish the market for the original – any bad review can have that effect – but rather whether it *fulfills the demand* for the original." *Fisher*, 794 F.2d at 437-38; *see also Maxtone-Graham*, 803 F.2d at 1264 (fact that copyrighted work and allegedly infringing work served "fundamentally different functions" weighed in favor of fair use finding on fourth factor).

Applying this test, courts consistently hold that parodies do not fulfill the demand for the works that they target, and thus the fourth factor favors fair use.  In *Fisher*, for example, the court found as a matter of law that demand for the song "When Sunny Gets Blue," a nostalgic reminiscence about lost love, would not be supplanted by the defendant's parody "When Sonny Sniffs Glue," a song describing the physical aftermath of glue-sniffing.  794 F.2d at 438.  In *Elsmere Music*, the court held that the song "I Love Sodom" would not satisfy the demand for the song "I Love New York."  482 F. Supp. at 747.  And in *Walking Mountain*, the court rejected the argument that the defendant's photographs of Barbie dolls in bizarre, sexual situations would have any recognizable effect on Mattel's sale or licensing activities.  353 F.3d at 804-06.

Here, Adjmi's parody does not remotely fulfill the same demand as *Three's Company*. The original television series is a lighthearted comedy that appeals to a mass audience that

---

[9] Courts have found parodies to be fair use even where the defendant asked the plaintiff's permission and was denied.  *Campbell*, 510 U.S. at 572, 585 n.18 ("[B]eing denied permission to use a work does not weigh against a finding of fair use."); *Fisher*, 794 F.2d at 437 ("Parodists will seldom get permission from those whose works are parodied.").

continues to view it on cable television to this day.  Counterclaims ¶ 28.  *3C* is a comedic, but dark and disturbing, play that harshly criticizes *Three's Company* and, to date, has been produced only in a small Off-Broadway theater in a limited run.  The latter use simply does not fulfill the demand for the former.  Because the two works serve "fundamentally different functions," the fourth factor weighs strongly in favor of fair use.

Taken together, the balance of the fair use factors – particularly the crucial first and third factors – tilts unquestionably toward a finding of fair use.

## CONCLUSION

For the foregoing reasons, Plaintiff/Counter-Defendants respectfully request that the Court grant their motion for judgment on the pleadings under Rule 12(c); issue a declaration that *3C* is a non-infringing fair use of *Three's Company* and that Adjmi is entitled to authorize publication and future productions of *3C*; and dismiss the Counterclaims in their entirety, with prejudice.

25

Dated: New York, New York
August 25, 2014

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: /s/ Edward J. Davis
    Edward J. Davis
    Camille Calman

1633 Broadway, 27th Floor
New York, New York  10019
(212) 489-8230

Bruce E. H. Johnson
(admitted *pro hac vice*)

Suite 2200
1201 Third Avenue
Seattle, Washington  98101-3045
(212) 489-8230

*Attorneys for Plaintiff/Counter-Defendant
David Adjmi*

FRANKFURT KURNIT KLEIN & SELZ, P.C.

    Toby Butterfield
    Andrew J. Ungberg
488 Madison Avenue, 10th Floor
New York, New York  10022
(212) 980-0120
tbutterfield@fkks.com
aungberg@fkks.com

*Attorneys for Counterclaim Defendants
Piece by Piece Productions, Inc.,
Rattlestick Productions, Inc. and
Rising Phoenix Repertory, Inc.*

26