**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DAVID ADJMI, | Civil Action No. 14 CV 568 (TPG) (JCF) |
|        Plaintiff, | |
|   v. | |
| DLT ENTERTAINMENT LTD., | |
|        Defendant, | |
| THREE'S COMPANY, A JOINT VENTURE, and DLT ENTERTAINMENT LTD., | |
|        Counter-Claimants, | |
|   v. | |
| DAVID ADJMI, | |
|        Counter-Defendant, and | |
| RATTLESTICK PRODUCTIONS, INC., RISING PHOENIX REPERTORY, INC., and PIECE BY PIECE PRODUCTIONS, INC., | |
|        Third-Party-Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF/COUNTER-**
**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**Table of Contents**

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     STANDARD OF JUDGMENT ................................................................. 2

III.    STATEMENT OF FACTS ...................................................................... 3

        A.      *Three's Company* ...................................................................... 3

        B.      *3C*'s Copying of *Three's Company*. ................................................ 4

                1.      The Plot, Setting, and Dialogue of *3C* are Non-Transformative Copies of *Three's Company*. ................................................... 4

                2.      Despite Being *Actually* Gay, *3C*'s Brad is a Non-Transformative Copy of *Three's Company's* Jack. ...................................................... 7

                3.      Despite Allusions to Sexual Abuse, *3C*'s Connie is a Non-Transformative Copy of *Three's Company's* Chrissy. ........................ 9

                4.      Despite Referencing Self-Consciousness, *3C*'s Linda is a Non-Transformative Copy of *Three's Company's* Janet. ............................... 11

                5.      *3C*'s Mrs. Wicker is a Non-Transformative Copy of *Three's Company's* Mrs. Roper. ..................................................................... 12

                6.      *3C*'s Mr. Wicker is a Non-Transformative Copy *of Three's Company's* Mr. Roper. ..................................................................... 13

                7.      *3C* Utilizes the Same Upbeat Tone as *Three's Company*. ..................... 14

        C.      Mr. Adjmi Used *Three's Company*'s "iconography as a springboard." .............. 15

IV.     ARGUMENT ....................................................................................... 15

        A.      The Play *3C* is Not a Fair Use or Parody of *Three's Company*. ..................... 15

                1.      The Purpose and Character of *3C*. ............................................... 16
                        a)      *3C* is Not a Transformative Parody. .................................. 16
                        b)      The Case Law Cited By Counter-Defendants is Inapposite. ........ 22

                2.      The Nature of the Copyrighted Work. ........................................... 25

                3.      *3C* Takes a Substantial Amount from *Three's Company*. ..................... 26

                4.      The Effect on the Market for Three's Company. ............................... 26

        B.      Discovery Should be Permitted to Make Further Factual Findings Regarding *3C*'s Alleged Transformative Use. ........................................................ 28

V.      CONCLUSION .................................................................................... 30

## **TABLE OF AUTHORITIES**

### **Cases**

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)...................................16

*Arrow Prods. v. Weinstein Co. LLC*, 13 Civ. 5488, 2014 U.S. Dist. LEXIS................................16
    119072 (S.D.N.Y. Aug. 25, 2014)

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 1:06-cv-04908,  ...........................................30
    2010 WL 2640095, No. 197 (S.D.N.Y. Jun. 30, 2010)

*Benny v. Loew's Inc.*, 239 F.2d 532 (9th Cir. 1956)  ............................................................. 18-19

*Berlin v. E. C. Publs., Inc.*, 329 F.2d 541 (2d Cir. 1964) ...........................................................30

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ............................................................................29

*Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F. Supp. 2d  .................................... 23-24
    499 (S.D.N.Y. 2009)

*Browne v. McCain*, 612 F. Supp. 2d 1125 (C.D. Cal. 2009) ........................................................29

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) ...............................23

*Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991 (E.D. Wis. 2011).................23

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1993) .................................2, 16-17, 19, 25-27

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013)............................................................................29

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 ..................................... 26-27
    (9th Cir. 1997)

*Effie Film v. Murphy*, 932 F. Supp. 2d 538 (S.D.N.Y. 2013) *aff'd*, 2014  ......................................3
    WL 1797466 (2d Cir. May 7, 2014)

*Four Navy Seals v. Assoc. Press*, 413 F. Supp. 2d 1136 (S.D. Cal. 2005) ....................................29

*Katz v. Chevaldina*, 900 F. Supp. 2d 1314 (S.D. Fla. 2012)........................................................29

*LaChapelle v. Fenty*, 812 F. Supp. 2d 434 (S.D.N.Y. 2011) .......................................................29

*Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998).................................... 24-25

*Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003)................................. 24-25

*MCA, Inc. v. Wilson,* 677 F.2d 180 (2d Cir. 1981) ......................................................................17

*Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Cooperative Prods., Inc.*,  .......................23, 27
    479 F. Supp. 351 (N.D. Ga. 1979)

*New Line Cinema Corp. v. Bertlesman Music Group*, 693 F. Supp. 1517  ........................... 19-20
    (S.D.N.Y. 1988)

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ......................................................17-18, 27, 29-30

*Salinger v. Colting*, 641 F. Supp. 2d 250 (S.D.N.Y. 2009) ....................................18-19, 21-22, 25

*Sarl Louis Feraud International v. Viewfinder, Inc.*, 627 F. Supp. 2d. 123 ..................................28
    (S.D.N.Y. 2008)

*Suntrust Bank v. Houghton Mifflin, Co.*, 268 F.3d 1257 (11th Cir. 2001).............................. 21-23

*Twin Peaks Prods., Inc. v. Publications International, Ltd.*, 996 F.2d 1366 ......................... 15-16
    (2d Cir. 1993)

*Walt Disney Prods. v. Air Pirates*, 581 F. 2d 751 (9th Cir. 1978)................................................18

**Statutes**

FED. R. CIV. P. 12(c) ......................................................................................................................2

FED. R. CIV. P. 12(d) ......................................................................................................................2

FED. R. CIV. P. 56(d)(2) .................................................................................................................2

17 U.S.C. § 107.............................................................................................................................15

**Others**

NIMMER ON COPYRIGHT § 2.12 .....................................................................................................17

NIMMER ON COPYRIGHT § 13.05[C][2] ..........................................................................................18

Defendant and Counter-Claimant DLT Entertainment Ltd. and Counter-Claimant Three's Company, A Joint Venture (collectively, "Three's Company") submit this memorandum of law in opposition to the Motion for Judgment on the Pleadings ("Mot. J. Plead") filed by Plaintiff and Counter-Defendant David Adjmi ("Adjmi"), and Third-Party Defendants Rattlestick Productions, Inc., Rising Phoenix Repertory, Inc., and piece by piece Productions, Inc.'s (the "Production Companies") (collectively, the "Counter-Defendants").

## I.      PRELIMINARY STATEMENT

The play *3C* (as written and as staged) is a poor adaptation of the television series *Three's Company*.  Counter-Defendants have stolen not only the heart of the work, but every theme, detail, and character, thereby infringing Three's Company's exclusive right to prepare derivative works.  Counter-Defendants claim that *3C* is a fair use and a parody of *Three's Company* and its "frivolous" tone.  *See* Mot. J. Plead. at 15.  Counter-Defendants base their parody defense solely on *3C*'s offensive language and conduct (added to provide cheap shocks to audience members' memory of the *Three's Company* characters), allegedly "new" themes (all timeworn in the original), and a new ending.  Under Supreme Court and local Circuit precedent, a lawful parody is one which critiques the original work and copies just enough to conjure up the original.  In contrast, *3C* copies large swaths of *Three's Company's* individually protected characters, setting, dialogue, tone, and plot and, rather than critique the show, simply amps up the vulgarity to appear provocative.  The play and stage production of *3C* (for which the Court does not have access to a recording) are not transformative and are not entitled to the parody fair use defense.

Substantively, Counter-Defendants' Rule 12(c) Motion is defective because: (1) *3C* is merely an adaptation of *Three's Company* and not a transformative fair use; and (2) even if the Court finds that *3C* is a parody, "more was taken than necessary," *i.e.*, "the copying [in *3C* was]

1

excessive in relation to its parodic purpose," and *3C* is thus not entitled to the defense of fair use. *See Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 589 (1993).

Procedurally, Counter-Defendants' pre-discovery Motion is defective because Counter-Defendants (1) have not submitted a recording of the stage production of *3C*, depriving the Court of the ability to compare the two works; and (2) improperly submit and rely upon the author's statements and supporting exhibits without giving Three's Company an opportunity to challenge their veracity.[1]   The Mot. J. Plead. is an improper vehicle to dispose of the case, and should be denied.

## II.   STANDARD OF JUDGMENT

Counter-Defendants have taken the aggressive procedural tactic of moving for a judgment on the pleadings under FED. R. CIV. P. 12(c).  As this Court has stated with respect to 12(c) motions:

> In deciding a FED.R.CIV.P. 12(c) motion the court applies the same standard as it would in deciding a Rule 12(b) motion—a plaintiff must plead sufficient facts to state a claim for relief that is plausible on its face.  . . . [In] an action for a declaratory judgment of non-infringement, plaintiff's burden on this motion is turned on its head. [Counter-Defendants'] may prevail on [their] Rule 12(c) motion only if the pleadings establish that there can be no set of facts to support an action for copyright infringement by [Three's Company] against [Counter-Defendants].  . . . [I]n deciding this motion, the pleadings — including both [Counter-Defendants'] complaint and [Three's Company's] answer to it— are both taken to be true.  Any inconsistencies between the allegations in these pleadings must be resolved in [Three's Company's] favor.

---

[1] Counter-Defendants have improperly submitted evidence outside of the pleadings, including reviews of the play *3C*, user comments related to the online reviews, images of the play *3C*, and self-serving statements made by Mr. Adjmi.  *See* First Amended Compl. at ¶¶ 14, 16, 27-28, 43-45, 70, 71; Mot. J. Plead. at 12, fn.8 at 17.  The Court may convert the Mot. J. Plead. to a Motion under Rule 56.  *See* FED. R. CIV. P. 12(d).  However, if the Court does so, Three's Company requests that the Court give Three's Company "a reasonable opportunity to present all the material that is pertinent to the motion," *id.*, and "allow time to obtain affidavits or declarations or to take discovery."  *See* FED. R. CIV. P. 56(d)(2).  Three's Company has submitted the requisite affidavit for such a request.  *See* Decl. of Michelle Mancino Marsh Pursuant to FED. R. CIV. P. 56(d)(2).

*See Effie Film, LLC v. Murphy*, 932 F. Supp. 2d 538, 555 (S.D.N.Y. 2013) (Griesa, J.), *aff'd*, 2014 WL 1797466 (2d Cir. May 7, 2014) (internal cites omitted).  As will be shown, Three's Company alleges numerous plausible facts that must be accepted as true under this standard.

## III.   STATEMENT OF FACTS[2]

### A.   *Three's Company*

*Three's Company* is a sitcom that aired new episodes on broadcast television from 1977 to 1984, and has been in syndication ever since.  The show is about a single man, Jack Tripper (played by John Ritter), who moves in with two single women Janet Wood (played by Joyce DeWitt) and Chrissy Snow (played by Suzanne Somers), and avoids issues with his landlords, Mr. and Mrs. Roper (played by Norman Fell and Audra Lindley), by pretending to be gay.[3]  The show follows the three roommates through their innuendo-laden but platonic misadventures, misunderstandings, and crises.

As set out in detail in the Counterclaims, while *Three's Company* often depicted farcical situations, it represented more than just light-hearted fare.  *Three's Company* broke taboos and commented on how 1970s and 1980s' society treated homosexuality, sexual mores, and traditional gender roles.  It was a game-changer in television, challenging an older society to become more in touch with modernity.  As one commentator wrote, *Three's Company* was a rebellion against the "straight-laced, postwar 1950s romanticism of *Happy Days* and *Laverne & Shirley*."  *See* Chris Mann, COME AND KNOCK ON OUR DOOR: A HERS AND HERS AND HIS GUIDE

---

[2] In its Motion, Counter-Defendants represent numerous facts as undisputed.  *See* Mot. J. Plead. at 2. Because there has been no discovery in the instant proceeding, *see* Doc. No. 47, Three's Company lacks the knowledge or evidence to dispute much of what Counter-Defendants represent as "undisputed."  Nevertheless, Three's Company disputes many of the "undisputed material facts" in the following sections.  *See infra* at § III.  For the avoidance of doubt, Three's Company explicitly disputes all facts in the first full paragraph in the Mot. J. Plead. at 5-6.

[3] Not all characters were present in every season.  For example, beginning in Season 4, Mr. and Mrs. Roper were replaced with Mr. Furley, played by Don Knox.

TO THREE'S COMPANY at 1 (St. Martin Press, N.Y. 1998) (Answer to Am. Compl. and Countercls., Ex. B, "Mann").

**B.**     **3C's Copying of *Three's Company*.**

The play *3C* is nothing more than an inferior and unauthorized derivative work of *Three's Company* that borrows *Three's Company*'s most recognizable features solely to capitalize on the show's success.  The play takes the same concepts, jokes, and all six of the show's main characters, including the characters' physicality, backgrounds, and demeanor.  *Three's Company* attacked some of the most controversial topics of its day, often making light of them, but commenting on them nonetheless.  *3C* builds on *Three's Company*, depicting the same type of sexual tensions and challenging the same orthodoxy that *Three's Company* challenged.

Counter-Defendants allege that Three's Company's allegations are "specious."  *See* Mot. J. Plead. at 6 fn. 1.  Far from it.  Below are just a few of the numerous similarities between the plot, setting, characters, themes, and tone of *Three's Company* and *3C*, which demonstrate that *3C* has not "transformed" anything.  Mot. J. Plead. at 18.  A more complete tabulation (based solely on the pleadings and exhibits in record) is attached to this brief.  *See* Decl. of Michael E. Sander, Ex. A, Chart of Similarities Between *Three's Company* and *3C* ("Similarities Chart").

**1.**     **The Plot, Setting, and Dialogue of *3C* are Non-Transformative Copies of *Three's Company*.**

The title *3C* is clearly a direct reference to the title *Three's Company*.  *3C*, like *Three's Company*, takes place in Santa Monica in 1978.  *3C* is set in an apartment living room with several visible doors leading to the kitchen, bathroom, bedrooms, and entrance.  This was the precise primary set of *Three's Company*.

*3C*'s lead female characters – blonde Connie and brunette Linda – are roommates, like *Three's Company*'s Chrissy and Janet characters, respectively.



*Three's Company* Season 1, Ep. 1



First Am. Compl. ("FAC"), Ex. B at 24; Carly Schwatz, *David Adjmi's 3C At New York City's Rattlestick Theater Through July 14*, THE HUFFINGTON POST (Sept. 9, 2012) (available at http://www.huffingtonpost.com/2012/07/06/david-adjmi-3c_n_1654139.html) ("Schwartz").

*3C* begins with Connie and Linda sitting on the sofa; it is the morning after a party for their former roommate, Beverly (Eleanor in *Three's Company*).  Their former roommate is gone and the characters complain about their hangovers.  Connie is wearing a nightgown, Linda is wearing a sports jersey.  Linda is combining undrunk wine from various glasses into a half-empty bottle using a funnel, and the two are cleaning up from the party.  They are concerned about paying the rent.  As the scene evolves, the male lead (Brad) appears in the girls' apartment as a "leftover" from the party who blacked out after drinking too much alcohol.  This is identical to the first episode of *Three's Company*.  Even the dialogue bears an uncanny similarity:[4]

| ***Three's Company (Season 1, Ep. 1)*** | **FAC, Ex. A, *3C* Script at 17** |
|---|---|
| **Jack**: I – I—last thing I remember I had a glass of that terrible punch and then everything went black. | **Brad**: (os; hungover) I was at the party last night.  . . .  I must've blacked out. |

---

[4] Adjmi tacitly admits to copying the dialogue of *Three's Company*, as evidenced by the amendments made in the FAC.  In the original Complaint (Doc. No. 1) at ¶ 3, Adjmi unequivocally stated that "*3C* copies no dialogue from *Three's Company*."  This assertion was sharply hedged in the FAC, and now states that "*3C* is not a copy of *Three's Company*[.]"  FAC at ¶ 3.

The story in *3C* unfolds with Linda and Connie suggesting that Brad take the place of the roommate who moved out.  The landlord will not allow a man to live with two women, so they need to pretend that Brad is gay.  This too is identical to the first episode of *Three's Company*. Counter-Defendants have not alleged that the setting in *3C* is transformative or in any way different from the setting in *Three's Company*.

With respect to the plot, Counter-Defendants allege that four differences in *3C* bring the play "far afield from the plotlines of *Three's Company*," and thus make the play transformative. *See* Mot. J. Plead. at 6.  First, in one scene in *3C* the characters use drugs.  *Id.*  Adjmi states that "no one seeing or reading *3C* could mistake it for a theatrical version of *Three's Company* authorized by DLT, given . . . its depiction of illegal drug use."  FAC ¶ 57.  However, *Three's Company* did depict drug use, devoting an entire episode to the mishaps that occur when Chrissy and Jack discover marijuana plants growing in their landlord's backyard.  *See Three's Company* Season 2, Ep. 22.  Further, in Season 6, Ep. 25, Jack takes tranquilizer pills, imbibes a drink called "rocket," and acts extremely intoxicated.  Moreover, the drug-use in *3C* plays no transformative role; it is used merely as a pre-text for sexual innuendo, the same type of sexual innuendo replete in *Three's Company*.  *See* FAC, Ex. A, *3*C Script at 66-67.  Thus, *3C*'s depiction of drugs is not new; it is simply another element copied from *Three's Company*.

Second, in *3C*, "Brad and Linda play a game called 'Faces' that involves changing their facial expressions to match an emotion shouted out by another character."  Mot. J. Plead. at 6. Counter-Defendants do not explain how this game makes *3C* transformative.  Moreover, the

"Faces" game in *3C* is obviously copied from *Three's Company* Season 6, Eps. 1 and 2,[5] where the characters tease each other by mimicking each other's expressions. Just as in *3C*, in *Three's Company* the game takes a darker turn when one of the housemates gets offended.

Counter-Defendants also allege that *3C*'s plot travels "far afield" from *Three's Company*, because "Linda helps Mrs. Wicker with calligraphy for party invitations," yet they fail to state how this minor element plays any part in making the work "transformative." Mot. J. Plead. at 6.

Finally, Counter-Defendants allege that *3C*'s plot is transformative because Brad "comes out" as gay. Mot. J. Plead. at 6. However, as discussed in the following section, this character element is also not transformative.

**2.      Despite Being *Actually* Gay, *3C*'s Brad is a Non-Transformative Copy of *Three's Company's* Jack.**

 

*Three's Company* Season 1, Ep. 1          *3C*. *See* FAC, Ex. B, Schwartz.

Brad's character in *3C* is copied from Jack's character in *Three's Company*. Both characters are military veterans studying to be chefs, and are clumsy and accident prone, humorously knocking into things or falling over. Both Brad and Jack are played by tall, attractive men, and treat the two women with whom they live respectfully and are non-

---

[5] The two episodes of Season 6 are a 50 minute double episode. The game in question starts at around minute 42 and becomes more serious around minute 46.

threatening.  *3C* plays Brad's clumsiness for slapstick comedy, as does *Three's Company* with respect to Jack.  Even relatively minor elements of dialogue are copied or mirrored in *3C*.  For example, *3C* copies a scene from Season 1, Ep. 2 of *Three's Company* where Janet tries to convince Jack to go to an art theater:

| *Three's Company  (Season 1, Ep. 2)* | FAC, Ex. A, *3C* Script at 58 |
|---|---|
| **Janet**: Oh, well how about the all-night showing of "War and Peace" at the art theater? That's only $3.00.<br><br>**Jack**: You've got to be kidding. | **Linda**: There's a Japanese movie at the art house on Beverly Boulevard, it's - It's supposed to be really good. . . .<br><br>**Brad**: I can't, I - I have homework. |

In both *Three's Company* and *3C*, Brad and Jack pretend to be gay, and the characters are subjected to gay jokes from their landlord.  Counter-Defendants assert Brad's character is transformative because in *3C*, Brad is actually gay.  Mot. J. Plead. at 20-21.  Adjmi contends that he wrote Brad to be actually gay to show that *Three's Company* "perpetuated harmful values," whereas *3C* "exposed, reversed, and undermined" those values.  FAC at ¶ 34.  But Adjmi is distorting *Three's Company* in order to support Counter-Defendants' empty "transformative" use defense.  In fact, *Three's Company* did not promote homophobia, it lampooned it.  The only character who voiced disapproval over Jack's pretended sexual orientation was the out-of-touch landlord Mr. Roper.  *Three's Company* was one of the first television shows to say that there was nothing wrong with being gay.  Said John Ritter, the actor playing Jack Tripper:

> I always thought it was cool because I was a heterosexual who didn't mind
> pretending to be gay – it wasn't a question of my masculinity and I didn't have to
> prove anything.  The only homophobia that was going on was with the landlord;
> everybody else was just fine about it.  And I think that was a nice attitude because
> a lot of gay people whom I've met since then and during the show like the idea
> that I wasn't a heterosexual who thought that [being gay] was something wrong.

Answer to Am. Compl. and Countercls., Ex. B, Mann at 51-52.  *Three's Company* writer Paul Wayne said of the Jack-is-gay plot element, "I guess we were trying to make social commentary."  *Id.* at 52.  And even though Mr. Roper did exchange jabs with Jack over his

supposed sexual orientation, Wayne said, "[w]e didn't play up gayness simply for the laugh you'd get for making somebody light in his loafers."  *Id.*  The "gay jokes" in *Three's Company* were not meant to offend gays, they were intended to poke fun at an older generation that was uncomfortable with homosexuality and show that being gay was normal.  Brad's character in *3C* attempts to affect this same purpose: that homophobia is inappropriate in modern society.  *3C* does not parody Jack's character.

3.      **Despite Allusions to Sexual Abuse, *3C*'s Connie is a Non-Transformative Copy of *Three's Company's* Chrissy.**

Connie in *3C* is just like Chrissy in *Three's Company*; she is blonde and feminine, and is endearingly innocent, but often confused, and misunderstands language and behavior to comedic effect.  In both *3C* and *Three's Company*, the character's father is a minister.  Connie is attractive and "jiggles," just like Chrissy.  Both characters are flirtatious and enticing.  Connie, like Chrissy wears provocative clothing.  Dialogue mirrors each other:

| *Three's Company (Season 1, Ep. 1)* | FAC, Ex. A, *3C* Script *at 58* |
|---|---|
| **Janet**: You saw the way he was looking at you in there.<br>I know you Chrissy, you have a very low melting point.<br><br>**Chrissy**: That's true.<br><br>**Janet**: I mean, just a little bit of sweet talk and you fall apart.<br>Look what happened with Frank. | **Linda**: You're always on dates. I hardly see you anymore.<br><br>**Connie**: I can't help it if guys like me -<br><br>**Linda**: Maybe you could help it if you'd stop wearing tight shirts and shaking your boobs everywhere!!<br><br>**Connie**: I don't shake my boobs everywhere!! |

Counter-Defendants assert the Connie character is transformative because "[t]he sexy, 'ditzy' blonde roommate [Chrissy] is a source of titillation and humor in *Three's Company*, but in *3C*, [Connie] struggles with fears of sexual abuse and rape."  *See* Mot. J. Plead. at 5.  Counter-Defendants point to only one line in *3C* to suggest Connie confronted sexual abuse, which apparently is enough for them to render her entire character "transformed."  *Id.* at 5, 21.

Regardless, the themes of sexual abuse were already central to *Three's Company*, which challenged traditional norms of the stereotypical machismo male that tied sexual dominance to masculinity.  Many *Three's Company* episodes feature overly aggressive men, either physically groping or assaulting young women.  Themes of sexual abuse in *3C* were copied from *Three's Company*, not added to it.  For example, in *3C*, Connie complains that "I had to quit, my boss was hitting on me!"  *See* FAC, Ex. A, *3*C Script at 7.  Similarly, in *Three's Company* Season 2, Ep. 6, a female character with a large bust laments how she had to quit her job because her "boss invited me up to his apartment after work to go over some forms, and he started with mine. . . . Men just take it for granted you'll say yes. . . . I am so tired of whistles and dumb remarks.'"  In Season 3, Ep. 16, Chrissy is assaulted by her boss and nearly fired over the encounter.  *See* Decl. of Michael E. Sander, Ex. A, Similarities Chart at 4.  In Season 2, Ep. 11, Janet's ex-boyfriend sexually attacks Janet, ripping her clothing and nearly rapes her.  *See id.* at 18.  These *Three's Company* scenes are traumatic, not uplifting.  Themes of sexual violence that Mr. Adjmi alleges are "new" to *3C* were addressed in many episodes of *Three's Company*; *3C* copies them.

*Three's Company* did not "ignor[e] and gloss[] over" the harmful realities of sexual violence, *see* FAC at ¶ 34; it condemned them.  *Three's Company* upheld the idea of a confident man who did not need to overtly assert sexual dominance, and mocked lewd acts of prurient men as idiotic or childish.  As David Marc comments in his book *Comic Visions: Television Comedy and American Culture,* the landlord in *Three's Company*, Mr. Roper, is the subject of much derision because he is part of an earlier generation which is out of touch with the modern understanding of sexuality.  *See* David Marc, COMIC VISIONS: TELEVISION COMEDY AND AMERICAN CULTURE, 180 (Blackwell Publishers 2002) (Answer to Am. Compl. and Countercls., Ex. C, "Marc").  Mr. Roper is "unable to conceive of the idea that a 'normal' man [such as Jack

Tripper] might share friendships – never mind an apartment – with women who were not doing his sexual bidding." *Id.* The landlord is labeled "unhip because he could not be casual about sexual matters," whereas the cohabitating trio "were hip" because they did not "fetishize sex, and thus, they were healthy and admirable[.]" *See* Answer to Am. Compl. and Countercls., Ex. B, Mann at 48. Jack Tripper's character was also intimately intertwined in this type of seditious social commentary. As explained by Don Nicholl, one of the head producers of *Three's Company*, Jack "reflects the times and the increased acceptability of nonsexual relationships between men and women. The old macho, leading-man image would never fit here. He started something new and I think it will be copied a lot." *Id.* at 46. In this way, *Three's Company* was far more subversive than *3C* at attacking sexual abuse. *3C* is not a parody of *Three's Company*; it is a poor and less effective knock-off.

**4.     Despite Referencing Self-Consciousness, *3C*'s Linda is a Non-Transformative Copy of *Three's Company's* Janet.**





*Three's Company* Season 1, Ep. 1.          *3C. See* FAC, Ex. B, Schwartz.

Linda in *3C*, just like Janet in *Three's Company*, is brunette and down-to-earth, and is depicted as the intelligent and reliable counterpart to her female roommate. Linda works in a flower shop, as does Janet. *3C*, like *Three's Company*, focuses on her self-consciousness over being less attractive and being perceived as less spontaneous than her female roommate. Both

11

Linda in *3C* and Janet in *Three's Company* are distrustful of men.  Linda's hair, boyish style, and wardrobe were copied directly from Janet.

Counter-Defendants allege that the themes of debilitating self-consciousness and low self-esteem were "starkly different" in *3C*.  Mot. J. Plead at 5.  Counter-Defendants suggest Adjmi was parodying Janet by writing the character Linda to "suffer[] from destructively low self-esteem" and make "self-punishing comments."  FAC at ¶ 38; Mot. J. Plead. at 5.  However, these elements were already present in Janet's character in *Three's Company*; Adjmi merely repeats them.  For example, *Three's Company* devotes nearly an entire episode to Janet's decision on whether to get breast augmentation surgery, focusing heavily on her insecurities:

| *Three's Company (Season 2, Ep. 3)* | FAC, Ex. A, *3C* Script at 13 |
|---|---|
| **Janet**: You men are all alike. . . . You know, when I first started high school I had absolutely no figure at all.  I kept praying I would blossom. One day – one day, the teacher asked the class to locate the great American flat-lands.  Every single boy in class pointed to me. . . . If we didn't need training bras by the time we were ten, our lives were ruined. | **Linda**: I'm ugly and I look like a dyke! <br> **Connie**: You are not a dyke. <br> [PAUSE] <br> **Linda**: I know what people say about me // <br> **Connie**: What? People // don't- <br> **Linda**: *(hurt)* I know what people say. |

In *3C*, Linda's character is groped, but as discussed in the previous section, the equivalent character in *Three's Company*, Janet, is nearly raped.  *See supra* § III.B.3.  Besides a few gratuitous curse words thrown into the *3C* script, Linda's character is simply a copy of Janet in *Three's Company*, and not transformative.

**5.    *3C*'s Mrs. Wicker is a Non-Transformative Copy of *Three's Company's* Mrs. Roper.**

In *3C*, the landlords are an older married couple (Mr. and Mrs. Wicker) as in *Three's Company* (Mr. and Mrs. Roper).  *Three's Company* was groundbreaking in its depiction of a married woman who is unhappy in her relationship due to a lack of intimacy with her husband. *3C* copies this plot element entirely, depicting Mrs. Wicker as neurotic and unhappy in her marriage, a woman who needs pills to make herself less anxious:

| *Three's Company (Season 3, Ep. 12)* | FAC, Ex. A, *3C* Script at *38* |
|---|---|
| **Janet**: What's wrong with your television?  **Mr. Roper**: I don't know it just doesn't turn on.  **Mrs. Roper**: Like everything else in our bedroom | **Mr. Wicker:** Cmon Phyllis, the food'll get cold.  **Mrs. Wicker:** Cold: Just like my marriage. |

The sexless relationship between Mr. and Mrs. Roper was a frequent theme of the show. However, *Three's Company* was doing much more than simply depicting Mrs. Roper as a "'wacky' old lady who complains about not getting enough sex," as Adjmi represents. *See* Mot. J. Plead. at 5. Rather, Mr. and Mrs. Roper's marriage parodied the traditional idea that men were the only ones who could be sexually undernourished in a relationship. Thus, *Three's Company* challenged the expectations of what women could demand in their marriages. As the actress playing Mrs. Roper, Audra Lindley, said: "It was a reverse of the cliché of the wife saying she had a headache. I think a lot of the older married women appreciated it – those who were married and didn't get enough sex from their husbands – because this was never talked about." Answer to Am. Compl. and Countercls., Ex. B, Mann at 49.

Even though *3C* changes the Mrs. Roper character by making her slightly more neurotic (Mrs. Roper in *Three's Company* did not take pills), this is merely a matter of degree, not substance.

**6.  *3C*'s Mr. Wicker is a Non-Transformative Copy *of Three's Company's* Mr. Roper.**

Mr. Wicker, like Mr. Roper, is a general (and reluctant) handyman. Both Mr. Wicker and Roper make jokes at the expense of their wives. Both are war veterans. Mr. Wicker in *3C* and Mr. Roper in *Three's Company* are both intended to be viewed at least somewhat contemptuously by the audience for their old-fashioned views and curmudgeonly outlook. Both are "openly homophobic" and make gay jokes. Mot. J. Plead. at 5. The only difference is that Mr. Wicker's gay jokes are more offensive, substituting the word "fairy" with "faggot." *See*

13

FAC, Ex. A, *3C* Script at 85.  It is hardly transformative to make an already offensive character more offensive.

Mr. Wicker gropes Linda in *3C*.  While Mr. Roper in *Three's Company* was boorish,[6] he does not grope the equivalent *Three's Company* character, Janet.  But by having Mr. Wicker's character grope Linda, *3C* did not transform Mr. Roper's character; it only served to cast the character as a bad person, and does not comment on the original in any substantive way.  Further, the fact that Linda was groped in *3C* does not introduce any new concepts to *3C* because, as discussed above, sexual aggression is a frequent theme of *Three's Company*.  *See supra* § III.B.3.

**7.     *3C* Utilizes the Same Upbeat Tone as *Three's Company*.**

Counter-Defendants' argument that *3C* focuses on "darkness pain and violence" rather than the "slapstick fare" present in the original is belied by actual reviews of the play:

> Presented at the Rattlestick Playwrights Theater, this co-production with Piece by Piece Productions and Rising Phoenix Repertory - three's company, too-oo! - had me scurrying from the theater with the television show's saccharine theme song ringing in my head, recalling a happier era when even bad sitcoms were not allowed to descend below a certain level of harmless tastelessness.

*See* FAC ¶ 50, Charles Isherwood, *Names Have Been Changed to Protect the Innuendoes '3C,'* NEW YORK TIMES THEATER REVIEW (June 4, 2012) (available at http://www.nytimes.com/2012/06/25/theater/reviews/3c-by-david-adjmi-at-rattlestick-playwrights-theater.html) ("Isherwood").

Counter-Defendants allege that "3C's stage directions[, which] call for overlapping dialogue so that the play proceeds at break-neck pace," somehow make the play transformative. *See* Mot. J. Plead. at 5-6.  But Counter-Defendants have not explained how this is so, and because Counter-Defendants have asserted that no recording of *3C* exists, they have no basis for

---

[6] For example, in Season 3, Episode 1, Mr. Roper spies on nude female sunbathers.

relying on the stage directions in support of their parody defense.  Rather, the stage directions during the extended dance sequences in *3C* appear up-beat and silly.  *See* FAC, Ex. A, *3*C Script at 20-22 ("BRAD: Yeah yeah yeah (*he cracks up*) . . . *They laugh.  . . . It's both enjoyable and a little insane.  Eventually they're worn out - they laugh and clap and stop dancing*").  Accordingly, *3C*'s "tone" is neither different nor transformative of *Three's Company*.

**C.     Mr. Adjmi Used *Three's Company*'s "iconography as a springboard."**

That *3C* does not rise to the level of parody, as confirmed by the above analysis, is no surprise.  When Mr. Adjmi started developing the script, he acknowledged that he "wanted to use this [*Three's Company's*] iconography as a springboard to talk about other things," and not to criticize it.  *See* Elisabeth Vincentelli, *Inside '3C,'* NEW YORK POST (July 9, 2012) (Answer to Am. Compl. and Countercls., Ex. D).  Adjmi even admitted that his "agents at CAA and my producers . . . doubted that the play would meet the legal standards of parody."  *See* Patrick Healy, *If Three Constitutes Company, Add Lawyers to Make it a Crowd*, NEW YORK TIMES (July 17, 2012) (available at http://www.nytimes.com/2012/07/18/theater/threes-company-lawyers-object-to-the-play-3c.html), Answer to Am. Compl. and Countercls. at ¶ 39; *see also* Mot. J. Plead. at fn.8, 17.  Yet, rather than contact DLT and seek to license *Three's Company*, Mr. Adjmi and the Production Companies[7] went forward with the production.

**IV.     ARGUMENT**

**A.     The Play *3C* is Not a Fair Use or Parody of *Three's Company*.**

Counter-Defendants do not dispute that *3C* slavishly copies *Three's Company*.  Rather, they allege that their extensive taking is protected under the fair use doctrine.  *See* 17 U.S.C.

---

[7] The Production Companies had agreed to not produce further productions of *3C*.

§ 107.  The fair use doctrine "tempers the protection of copyright by allowing . . . [the] use [of] a limited amount of copyrighted material under some circumstances."  *Twin Peaks Prods., Inc. v. Publications International, Ltd.*, 996 F.2d 1366, 1373 (2d Cir. 1993); *Arrow Prods. v. Weinstein Co. LLC,* 13 Civ. 5488, 2014 U.S. Dist. LEXIS 119072, 2014 WL 4211350 (S.D.N.Y. Aug. 25, 2014).  Because fair use is an affirmative defense, the party claiming it carries the burden of proof in establishing it.  *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994).  Fair use is underpinned by four non-exclusive factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  *See* 17 U.S.C. § 107.

1.      **The Purpose and Character of *3C*.**

For the first statutory factor, a court asks whether the accused work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message[,] . . . in other words, whether and to what extent the new work is transformative."  *Campbell*, 510 U.S. at 579 (citations and marks omitted).

a)      ***3C* is Not a Transformative Parody.**

An analysis of the first fair use factor should begin with the Supreme Court's seminal opinion *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1993).  In *Campbell*, Roy Orbison's romantic ballad *Oh, Pretty Women* was mocked and criticized in a rap song by 2 Live Crew.  *Id.* The rap song used the same bassline, but the romantic lyrics were replaced with talk of a hairy woman, her bald-headed friend, and denunciation of a "two-timin' woman."  *Id.* at 596.  The Court found the rap song to be a transformative parody of the original.  *Id.* at 594.  The Court defined parody as an "artistic work that imitates the characteristic style of an author or a work for

comic effect or ridicule," and "use[s] some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works."  *Id.* at 580.  Further, the parodic character of the work must "reasonably be perceived."  *Id.* at 582.

However, the Court was unwilling to cast *any* parody as a fair use.  *Id.* at 581 ("parody may or may not be fair use").  When an original work is used merely to "get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other [fair use] factors . . . loom larger." *Id.* at 580.  Because it is easy to allege that elements of any accused work criticize an original, the *Campbell* court was wary of abuse of the parody defense in copyright infringement cases, as Justice Kennedy noted in his concurrence:

> Almost any revamped modern version of a familiar composition can be construed as a comment on the naivete of the original, because of the difference in style and because it will be amusing to hear how the old tune sounds in the new genre.  Just the thought of a rap version of Beethoven's Fifth Symphony or "Achy Breaky Heart" is bound to make people smile.  If we allow any weak transformation to qualify as parody, however, we weaken the protection of copyright.

*Id.* at 599 (Kennedy, J., concurring) (internal cites omitted); *see also* NIMMER ON COPYRIGHT § 13.05[C][2] (discussing *Campbell*: "a fertile imagination or a literature degree could probably suffice to locate some commentary . . . between any two works picked at random.  Justice Kennedy's concurrence cautions against the danger that copyright defendants will take refuge in the *post hoc* testimony of literary critics"); *MCA, Inc. v. Wilson,* 677 F.2d 180, 185 (2d Cir. 1981) ("We are not prepared to hold that a commercial composer can plagiarize a competitor's copyrighted song, substitute dirty lyrics of his own, perform it for commercial gain, and then escape liability by calling the end result a parody or satire on the mores of society.  Such a holding would be an open-ended invitation to musical plagiarism.").

The facts of this case fall squarely within this Circuit's decision in *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), which Counter-Defendants fail to cite.  In *Salinger*, the estate of author J.D. Salinger brought suit against the author of a novel that adapted and used the characters, plot, and setting from *The Catcher in the Rye*.  *See id.* at 72.  Like here, the accused infringer invoked the parody fair use defense, asserting that a character named "Mr. C" in the accused work was a transformative parody of *Catcher's* central character, Holden Caulfield.  The character in the accused work was an older version of Caulfield and the author of the accused work alleged that the advanced age of his character was critical comment about the original:

> [Defendants contend the] style and content . . . [of] Holden Caulfield, [] coming from a 16 year old, [seem] . . .  honest and endearing.  Coming from the 76 year old [in the accused work], however, they seem pathetic.  Suggesting a life of isolated drifting, they evoke Aristotelian fear and pity - that is, they force readers to ask whether such anomie is all we fans of Holden may expect in old age.  If this is where his rebellious independence leads, is it as attractive as we adoring fans of [*Catcher in the Rye*] imagined?

*Salinger v. Colting*, 641 F. Supp. 2d 250, 258 (S.D.N.Y. 2009) (district court opinion quoting defendant's expert testimony).  The district court properly rejected defendant's argument that the accused work was transformative on the same premises that Three's Company asks the Court to follow here.  *Id.* at 258.  First, the court found that much of the allegedly critical tone and content in the accused work was already present in the original.  *See id.* at 259 ("In fact, it can be argued that the contrast between Holden's authentic but critical and rebellious nature and his tendency toward depressive alienation is one of the key themes of *Catcher*.").  Similarly, in the instant case, all of the allegedly critical and parodic elements in *3C* were in *Three's Company*, *e.g.*, sexual aggression, drug use, homophobia, self-consciousness and self-esteem issues.  *See supra* at § III.B.1-7.  Simply focusing on these elements and infusing shocking language or conduct is insufficient to make a new work transformative.  *See, e.g.*, *Walt Disney Prods. v. Air Pirates*, 581 F. 2d 751 (9th Cir. 1978) (verbatim copying of "innocent" Disney characters as "promiscuous

[and] drug ingesting" took too much from the original and was not sufficiently transformative);

*Benny v. Loew's Inc.*, 239 F.2d 532, 536 (9th Cir. 1956) (copying a work "practically verbatim"

while adding "grotesqueries, does not avoid infringement").  Accordingly, as in *Salinger*, the

Court should review *Three's Company* for the themes it already presented, and ascribe little

transformative value to the same themes in *3C*.

Second, as in *Salinger*, even assuming some elements of the accused work are found to

be transformative, the Court here can nevertheless reject Counter-Defendants' overall fair use

defense.  *See Salinger*, 641 F. Supp. 2d at 262-63 ("while there is some non-parodic

transformative element in [the accused work] . . ., its effect is diminished" because the

transformative elements are "present in only 40 of 277 pages").  The court in *Salinger* noted that

"where a work is not consistently transformative, and lacks restraint in using [Plaintiff's] original

expression for its inherent entertainment and aesthetic value the transformative character of [the

accused work] is diminished."  *Id.* at 262 (internal quotations omitted).

Similarly here, even assuming *arguendo* some aspects or parts of *3C* were transformative

or parodic, Counter-Defendants overreach when they contend that *3C*'s copying on an overall

basis is fair.  *3C* copied nearly *everything* about the series –the characters, setting, themes, plot,

jokes, and numerous small details.  *See supra* at § III.B.  In fact, if the shocking language and

conduct was toned down, the *3C* script could easily be mistaken for *Three's Company*'s pilot

episode.  Accordingly, assuming *arguendo* the Court finds some elements of *3C* transformative,

"the ratio of the borrowed to the novel elements is quite high," *i.e.*, the copying is "extensive in

relation to the parodic element."  *Salinger*, 641 F. Supp. 2d at 262-63; *New Line Cinema Corp. v.

Bertlesman Music Group*, 693 F. Supp. 1517, 1527 (S.D.N.Y. 1988) (finding no parody of *A

Nightmare on Elm Street* "[e]ven under the Second Circuit's liberal approach with respect to

parody . . . [the defendants] appropriated more than is permitted. . . . Instead of using just the claw or just the slash marks or just the music or just the plot or just the imagery or just the murderous personality or just the dream sequences, [the defendants] appropriated them all").

Counter-Defendants' attempt to explain the allegedly transformative character traits in *3C*'s characters is unpersuasive. *3C*'s alleged purpose in making Brad actually gay was to critique archaic homophobic notions – a concept already integral to Jack pretending to be gay in *Three's Company*. *See supra* at § III.B.2. Connie, who in one scene "uses cocaine and has had trouble with romance" due to an abusive past, shares every feature of Chrissy with almost no change. *See* Mot. J. Plead. at 21; *supra* at § III.B.1. Both characters are sweet, ministers' daughters, make inadvertent jokes, and get wanted and unwanted attention from men. *Id.* Based on what is discernable on the pleadings, in the stage production, the similarities are even more striking –the characters are blond, thin, attractive, ditzy, and wear sexy nighties. Adjmi cannot rely on Connie's drug use or sexual assaults to claim she is transformative because in *Three's Company* the plots also involve drug use (including taking tranquilizers and growing marijuana), and Chrissy (as well as Janet) dealt with numerous sexual assaults. *See supra* at § III.B. What has Adjmi done to this character to parody her? The answer is nothing. Connie is Chrissy and Chrissy is Connie.

The conclusion is the same for the other characters –Linda's low self-esteem was a frequent theme of Janet in *Three's Company*. *See supra* at § III.B.4. In *3C*, Linda gets molested, but in *Three's Company* Janet is nearly raped. *See* Decl. of Michael E. Sander, Ex. A, Similarities Chart at 18; *supra* at § III.B.5. *3C*'s Mrs. Wicker is the same as Mrs. Roper, but with her anxiety simply turned up by a degree. Similarly, Mr. Wicker, just like Mr. Roper, is homophobic; while in *3C* his homophobic jokes are more numerous and more graphic, they are

hardly transformative.  *See supra* at § III.B.6.  Thus, literally all of the character elements that Counter-Defendants contend are "new" were already present in *Three's Company*; *3C* just dialed up the anxiety, became more vulgar, and swapped the drug-of-choice, which is hardly transformative.  *Cf. Salinger*, 641 F. Supp. 2d at 262 ("Nor do the mere facts that Holden Caulfield's character is 60 years older, and the novel takes place in the present day make 60 Years 'transformative.'"); *Campbell* at 598 (Kennedy, J., concurring) ("courts should not accord fair use protection to profiteers who do no more than add a few silly words to someone else's song or place the characters from a familiar work in novel or eccentric poses").

Counter-Defendants claim that *3C* "exposes the hollowness of [*Three's Company*'s] portrayal of the times by presenting its own series of surreal, often painful – though sometimes darkly comical – incidents" and ends "on a decidedly unresolved note."  Mot. J. Plead at 6.  First, the alleged "note" of *3C* is impossible to ascertain based solely on the script without viewing the play as performed.  Further, giving an alternative ending to a work is not transformative.  *See Campbell*, 510 U.S. at 589 ("where the parody is so insubstantial, as compared to the copying, [] the third factor must be resolved as a matter of law against the parodists").  Moreover, the *3C* script recycles the slapstick jokes, personality quirks, and edgy plot that the original *Three's Company* series relied on to entertain audiences in the 70s.  *See supra* at § III.B (Jack klutzes around; Chrissy acts ditzy; women are sexually harassed).  Counter-Defendants expect the Court to simply take their word that *3C* is a scathing critique of *Three's Company*, but the situations created by Mr. Adjmi suggest little antagonism with the original series.  Rather, *3C* takes well-known characters and merely adapts them to the stage without the constraints of FCC rules.

**b)      The Case Law Cited By Counter-Defendants is Inapposite.**

Counter-Defendants put much weight on the out-of-circuit case *Suntrust Bank v. Houghton Mifflin, Co.*, 268 F.3d 1257 (11th Cir. 2001), where the court found the accused work to be fair use even though it copied *some* elements of the original work's "characters, story lines, and settings." *See id.* at 1267.   However, *Suntrust Bank* was decided before the Second Circuit's *Salinger* decision, and the *Salinger* district court directly addressed it.   *Salinger*, 641 F. Supp. 2d at 257.  In *Suntrust*, the original work (*Gone With The Wind*) was a third person epic.  *Id.*  In contrast, the accused work (*The Wind Done Gone*) was a fictional diary written in the first-person.  *Id.*  The author of the fictional diary was a minor character in the original novel, a nameless servant to one of the main characters, and was written from an entirely different viewpoint.  *Id.*  Beyond the different literary style, the protagonist was a minor character looking in, giving the book a unique vantage point to criticize the original work's depiction of race and slavery.  Echoing the concurrence in *Suntrust Bank*, this Court explained that "[h]ad [the author of the accused work] chosen to write *The Wind Done Gone* from the point of view of one of [the] original characters . . . and done no more than put a new gloss on the familiar tale without criticizing or commenting on its fundamental theme and spirit, [Defendant's] case would have been much tougher."  *See Salinger*, 641 F. Supp. 2d at 269 n.2 (quoting *Suntrust Bank*, 268 F.3d at 1279 (Marcus, J., concurring)).   This observation is directly on point.   In *3C*, Adjmi made no effort to change the perspective or to tell the story from the viewpoint of a new character.   The *Three's Company* world is presented exactly as in the original, in the same format and with the same viewpoint.   In addition, the language of the fictionalized diary from *The Wind Done Gone* was a distinct departure from the original prose.  *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1270 (11th Cir. 2001).  Adjmi's minor extensions in *3C* of preexisting themes and

topics in *Three's Company* represent no more than "a new gloss on [a] familiar tale" that the court in *Suntrust*, and again in *Salinger*, warned would be insufficient to avoid infringement. *Id.* at 1279.

Counter-Defendants fail to cite the counterpoint case to *Suntrust Bank*, in which the court found another work accused of parodying *Gone With The Wind* –this time a play– to *not* be a fair use parody. *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Cooperative Prods., Inc.*, 479 F. Supp. 351, 356 (N.D. Ga. 1979). In *Metro-Goldwyn-Mayer*, the accused work, like *3C*, employed "modern vernacular." *Id.* at 356. Further, the work's tone was changed, "exaggerat[ing] [the] traits of [a character], thereby critically commenting upon them," a claim also made by the Counter-Defendants. *Id.* at 355, 358. Nevertheless, the Court found that despite the "disparities in theme, content, and style between the works, where they do exist, [they] are not very significant. . . . Given the fact that the characters, plot, and dialogue of *Gone With The Wind* are well-known to the public, it appears that such extensive copying of the original works was not necessary to 'conjure up' or 'recall.'" *Id.* at 359; *see also id.* at 361 ("even if [the accused work] was a parody or satire, [it] would not be protected by 'fair use' because it copies more of *Gone With The Wind* than is allowed").

Counter-Defendants cite four additional parody cases that are also distinguishable. Mot. J. Plead. at 14-17. In each, the parodic elements in the accused work were not just perceptible, but conspicuous on their face. Here the parody is imperceptible and is being argued on a Motion on the Pleadings before discovery. In *Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687 (7th Cir. 2012), the original work was a live-action music video with explicit allusions to anal intercourse. The accused work was vastly different: a cartoon criticizing the immense popularity

23

of the original, and which actually depicted characters watching the video and mocked them.  *Id.*;
*see also Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991 (E.D. Wis. 2011).

Counter-Defendants also cite *Bourne Co. v. Twentieth Century Fox Film Corp.*, 602 F.
Supp. 2d 499 (S.D.N.Y. 2009), wherein the court determined that a song from a TV cartoon
show, which closely resembled that of the copyrighted song *When You Wish Upon a Star*, was a
parodic fair use.  *Id.* at 499.  However, in *Bourne*, the parties had stipulated that the accused song
was transformative.  *Id.* at 503 ("The Parties also agree that at least one of the purposes of the
song used in the Episode was to hold bigotry and people like Peter Griffin [the lead character of
the TV show] up to ridicule.").  Here, Three's Company has not made such an agreement (and in
fact, vehemently disputes this issue).  In addition, in *Bourne*, the lyrics of the accused song were
"almost entirely different from those of 'When You Wish Upon a Star'—and are strikingly
different in tone and message."  *Bourne* at 509.  In contrast, *3C* is extremely similar to *Three's
Company*.  Although Counter-Defendants allege a different "tone," it is impossible to discern
where *3C* departs from the original based on the minimal and contradictory stage direction and
without further discovery.  Mot. J. Plead. at 5; *see supra* § III.B.7 (discussing 3C's upbeat tone).

Counter-Defendants also cite two cases concerning photography, even though they do not
allege that, visually, *3C* is any different or is a parody of *Three's Company*.  In *Mattel Inc. v.
Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003), the original work was a Barbie doll, and
the accused works were photographs of nude Barbies juxtaposed with kitchen appliances in
bizarre scenarios.  *Id.* at 801.  The court noted that Mattel markets Barbie in "glamorous
lifestyles and engaged in exciting activities . . . [using] associations of beauty, wealth, and
glamour," whereas in the accused works "Barbie is about to be destroyed or harmed by domestic
life in the form of kitchen appliances".  *Id.* at 802.  By looking at a Barbie and the accused

photographs, "[i]t is not difficult to see the commentary . . . on gender roles and the position of women in society."  *Id.* at 802.  In *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998), the court compared "a serious portrayal of a beautiful woman taking great pride in the majesty of her pregnant body . . . [and] a ridiculous image of a smirking, foolish-looking pregnant man" and found the secondary work sufficiently transformative.  *Id.* at 115; Mot. J. Plead. at 15.  These cases are inapposite.  Certainly with respect to the visual elements, *3C* contains no such patently striking contrast: the beautiful woman in *Three's Company* (Chrissie) remains the beautiful woman in *3C* (Connie); the handsome man remains the handsome man (Jack/Brad); and the settings, styles, and costumes are nearly identical.  This is hardly the skewering and incongruity alleged in the *Mattel* case.  *See* Decl. of Michael E. Sander, Ex. A, Similarities Chart at 1.  The characters' personalities are also identical, and unlike *Mattel,* and *Leibovitz*, no striking parody becomes apparent when viewing them side-by-side.

Thus, none of the cases cited by Counter-Defendants require the court to find that *3C* is transformative or a parody of *Three's Company.*

## 2.     The Nature of the Copyrighted Work.

*Three's Company*, the television series, is a highly creative original work and "closer to the core of intended copyright protection than [other works], with the consequence that fair use is more difficult to establish when the former works are copied" *Campbell*, 510 U.S. at 586.

Further, the *Three's Company* characters were richly developed, brought to life over the course of one hundred and seventy-four episodes; they are not mere "stock characters" as alleged by Counter-Defendants.  Mot. J. Plead. at 4.  Each *Three's Company* character is "sufficiently [in fact, highly] delineated" and, therefore, independently copyrightable.  *See Salinger*, 641 F. Supp. 2d at 254 ("the character of Holden Caulfield . . . is sufficiently delineated so that a claim for infringement will lie.");  Nimmer on Copyright § 2.12 ("it is clearly the prevailing view that

characters *per se* are entitled to copyright protection."). Counter-Defendants did not just take the clichés of a "'ditzy' blonde," a "perky and sensible" brunette, a "'wacky' old lady," and a "crotchety" landlord. *See* Mot. J. Plead. at 5. Rather, they took Chrissy, Janet, and the Ropers (as well as Jack), and all the small traits and quirks that make these characters special. Not just the show, but each character in *Three's Company* is a highly creative work, and this factor weighs heavily in favor of Three's Company.

**3.     *3C* Takes a Substantial Amount from *Three's Company*.**

The amount of Counter-Defendants' taking, as detailed above, is significant from both a qualitative and a quantitative standpoint. *See supra* at § III.B. Counter-Defendants have pilfered every one of *Three's Company's* main characters, including their personalities and backgrounds, the setting, the plot, the jokes, the costumes, the hair styles, the gags, the barbs, and the more serious themes. *Id.* Even assuming *arguendo* that *3C* is intended as a parody, there was no reason for Counter-Defendants to copy all of the countless minor elements, which neither had a parodic purpose nor were necessary to conjure up the original, *e.g.*, going to an "art house" theater; the blonde is a minister's daughter; the girls recycle wine from a party; the male suggests making food with one onion; and countless others as enumerated in the Similarities Chart. *See id.*; Decl. of Michael E. Sander, Ex. A, Similarities Chart; *see also Campbell* at 589 ("In parody, . . . context is everything, and the question of fairness asks what else the parodist did besides go to the heart of the original").

**4.     The Effect on the Market for Three's Company.**

Counter-Defendants' assertion that the fourth factor is irrelevant when making a parody determination is wrong and contradicted by Supreme Court precedent. *Campbell*, 510 U.S. at 581 ("parody, like any other use, has to work its way through the relevant factors"). *Campbell*, ultimately found the allegedly infringing work a parody, but the Supreme Court nevertheless

remanded the case for further factual determinations on this fourth factor.  *See* 510 U.S. at 594 ("[I]t is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense . . . to summary judgment.  The evidentiary hole will doubtless be plugged on remand."); *see also Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997) ("[defendants] must bring forward favorable evidence about relevant markets").  The reason that the fourth factor is still relevant despite a finding of parody is because a "parody may or may not be fair use."  *Campbell*, 510 U.S. at 581.  "[A] work with slight parodic element and extensive copying will be more likely to merely 'supersede the objects' of the original."  *Id.* at 600, fn.16.

Authorized *Three's Company* productions would seem hackneyed or a "rerun" to an audience that had already seen the very same characters, set, and plot in *3C*.  Accordingly, *3C* diminishes the novelty of, and the market for, an authorized *Three's Company* stage adaptation. *See Salinger,* 607 F.3d at 74 ("an unauthorized sequel might undermine the potential market for an authorized Catcher sequel, whether through loss of the novelty of a sequel or through confusion as to which of the sequels is the authorized one.").

Further, Counter-Defendants contention that *3C* "does not remotely fulfill the same demand as *Three's Company*" is belied by audience reviews.  *See* Mot. J. Plead. at 24.  One reviewer appears to have been seen the play precisely because it was a riff-off: "three's company, too-oo! - had me scurrying from the theater with the television show's saccharine theme song ringing in my head, recalling a happier era when even bad sitcoms were not allowed to descend below a certain level of harmless tastelessness."  *See* FAC ¶ 50, Isherwood.

Counter-Defendants' argument that *3C* is just a "small Off-Broadway" show and could not fulfill the demand of a large cable television show is inapposite.  *3C* fulfills the demand for a

staged production of *Three's Company*; and the fact that not many people fit in the theater, is

irrelevant.  *See Metro-Goldwyn-Mayer*, 479 F.Supp. 351, 355 (finding a play infringed *Gone*

*With the Wind* where the theater held just "150 to 200 seats").  Moreover, if the play is permitted

to be published and further productions are allowed to go forward, as Adjmi requests, the play

can be staged in any number of theaters, of any size.  *See* FAC at p.19 ¶ 1.

**B.     Discovery Should be Permitted to Make Further Factual Findings Regarding *3C*'s Alleged Transformative Use.**

Procedurally, Counter-Defendants' motion must fail.  Unlike every parody case cited by

Counter-Defendants, in this case, the accused work *as performed* is not before the Court,[8] and

the Court, therefore, cannot fully compare *3C* and *Three's Company*.  Counter-Defendants ask

the Court to limit its analysis to a "look at the script," Mot. J. Plead. at 12.  However, many

elements central to a parody analysis are not apparent from the script, *e.g.*, *3C*'s setting, costume,

style, pace, and, most importantly, tone.  In the absence of a full recording, Three's Company is

entitled to seek evidence such as taped rehearsals; photographs of the performance; and

deposition testimony from those involved in its production as well as audience members.  *See*

*Sarl Louis Feraud International v. Viewfinder, Inc.*, 627 F. Supp. 2d, 123, 133, fn.13 (S.D.N.Y.

2008) (this Court relied on testimony regarding similarities between the original and the

allegedly infringing work in the absence of copies of the original).

While Three's Company does not have access to the most basic evidence (the accused

work), Counter-Defendants have submitted and relied upon Adjmi's self-serving statements in

---

[8] Counter-Defendants aver that no taped recording of a public performance of *3C* exists and have opposed Three's Company's efforts to obtain any discovery into its production.  Mot. to Stay Disc. at 4; Reply Mem. of Law ISO Mot. To Stay at fn. 8 at 7 ("To the extent that DLT and the Joint Venture suggest that there are recordings of *3C*'s production or rehearsals . . ., no such recordings exist.").

both their FAC and their Motion on the Pleadings.  *See* FAC ¶¶ 14, 16, 27, 28, 43, 44, 45, 70, 71;

Mot. J. Plead. at 12, fn.8 at 17.  Without access to cross-examination, Three's Company is

prejudiced and the Court should not grant Counter-Defendants' Motion.  *LaChapelle v. Fenty*,

812 F. Supp. 2d 434, 448 (S.D.N.Y. 2011) ("Defendants raise a fair use defense to copyright

infringement, but the record is insufficient to make such a fact-intensive ruling as a matter of

law."); *Katz v. Chevaldina*, 900 F. Supp. 2d 1314, 1315 (S.D. Fla. 2012) ("a fair use defense

typically cannot be analyzed upon a Rule 12(b)(6) motion"); *Browne v. McCain*, 612 F. Supp. 2d

1125, 1130 (C.D. Cal. 2009) ("courts rarely analyze fair use on a 12(b)(6) motion."); *Four Navy*

*Seals v. Assoc. Press*, 413 F. Supp. 2d 1136, 1148 (S.D. Cal. 2005) ("Defendants devote many

pages of briefing to their argument that their use of the photograph was a non-infringing fair use.

However, that issue is inappropriate for determination in a 12(b)(6) motion[.]").

Counter-Defendants wrongly argue that deposition testimony and other discovery[9] is

irrelevant to whether *3C* is a parody.  *See* Mot. J. Plead. at 17.  Counter-Defendants' argument is

based on Second Circuit *dicta* in the *Cariou* decision, but they take this *dicta* too far and out of

context.  *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013).  While *Cariou* found a defendant's

intent not to be dispositive, the Court went no further and did *not* say that such testimony would

be *irrelevant*, or that taking the artist's testimony would be improper.  *Id.*  Indeed, in an earlier

parody case, the Second Circuit quoted both the original and the accused artists' testimony at

length.  *See Blanch v. Koons*, 467 F.3d 244, 252-55 (2d Cir. 2006) (finding the "different

objectives" of the original and accused artists, as reflected in their testimony, probative of

---

[9] Such evidence will include Adjmi's deposition testimony, as well as advertisements; marketing materials; playbills; draft versions of *3C*; additional stage directions; reviews; and testimony from critics and audience members.  *See* Decl. of Michelle Mancino Marsh Pursuant to FED. R. CIV. P. 56(d)(2) at ¶ 5.

whether the accused work was transformative).  Further, in *Salinger*, the Second Circuit found that the accused author's statements regarding the accused work were relevant to finding that the accused work was not transformative and thus not protected under the fair use doctrine.

*Salinger*, 607 F.3d at 83; *see also Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 1:06-cv-04908, 2010 WL 2640095, No. 197 (S.D.N.Y. Jun. 30, 2010) ("the [discovery and deposition] . . . was made relevant to the copyright claims by Fly's assertion of a fair use defense, which necessitated discovery into the 'purpose and character' of Fly's use of the reports and the 'effect of [Fly's] use upon the potential market for or value of the [copyright owners' reports].'"); *Berlin v. E. C. Publs., Inc.*, 329 F.2d 541 (2d Cir. 1964) (considering whether "the parody [had] . . . *the intent* [or] the effect of fulfilling the demand for the original" (emphasis added)).

Accordingly, the Court should deny Counter-Defendant's Motion solely because the record is incomplete, and plausible facts suggest that *3C* is not a parody.

## V.   CONCLUSION

For the reasons above, the Court should deny Counter-Defendants' Motion for Judgment on the Pleadings.

Dated: October 28, 2014

By:   */s/ Michelle Mancino Marsh*

KENYON & KENYON LLP
Jonathan D. Reichman (JR3243)
Michelle Mancino Marsh (MM1494)
Michael E. Sander (MS9999)
jreichman@kenyon.com
mmarsh@kenyon.com
msander@kenyon.com
One Broadway
New York, New York 10004
Phone: (212) 425-7200
Fax.: (212) 425-5288
*Attorneys for Defendant and Counter-Claimant DLT Entertainment Ltd. and Counter-Claimant Three's Company, A Joint Venture*