UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                   :
DAVID ADJMI,                       :        14 Civ. 568 (LAP)
                                   :
          Plaintiff,               :
                                   :        OPINION & ORDER
     v.                            :
                                   :
DLT ENTERTAINMENT LTD.,            :
                                   :
          Defendants.              :
                                   :
-----------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

      This is an action for declaratory judgment brought by
David Adjmi ("Admji") against DLT Entertainment LTD ("DLT").
Adjmi is a playwright who authored 3C, a play based on the
1970's television comedy series Three's Company.  The play was
produced for a limited run Off Broadway in 2012 by Rattlestick
Products, Inc., Rising Phoenix Repertory, Inc., and Piece By
Piece Productions, Inc. (the "Production Companies").  DLT, the
copyright holder of Three's Company, sought to halt all
performances of 3C and claims that the play infringes DLT's
copyright in Three's Company.  Adjmi wishes to authorize
publication of 3C and licensing of the play for further
production and therefore brings this action seeking a
declaration that 3C does not infringe DLT's copyright in Three's
Company.  Adjmi's motion [dkt. no. 34] is GRANTED for the
following reasons.

I.    BACKGROUND AND PROCEDURAL HISTORY[1]

On June 6, 2012, 3C began a run Off Broadway at Rattlestick Playwrights Theater ("Rattlestick"), located in New York City.  (FAC ¶ 60, Ex. C; Answer ¶ 61.)  Shortly thereafter, on or about June 14, 2012, lawyers representing DLT sent a "cease-and-desist" letter to Rattlestick, among other parties, asserting that 3C infringed DLT's copyright in Three's Company and demanding that Rattlestick "cease further performances of [3C]; provide ... an accounting of all revenues derived from 3C to date; and furnish DLT with ... written assurance that [Rattlestick and others] will fully comply with these demands." (FAC ¶ 61; Answer ¶ 61.)  Although 3C's production ended in July 2012 (FAC ¶ 61), DLT's "cease-and-desist" letter resulted in a back-and-forth between Adjmi's counsel and lawyers for DLT. (FAC ¶¶ 62-66; Answer ¶¶ 62-66.)

The reason for the continued correspondence, and for the present action, is because Admji claims he has received an offer to publish 3C and to license its performance.[2]  (FAC ¶ 67.)

---

[1] See Complaint, dated Jan. 30, 2014 [dkt. no. 1] ("Complaint"); First Amended Complaint, dated Feb. 25, 2014 [dkt. no. 6] ("FAC"); Answer and Counterclaims, dated Mar. 24, 2014 [dkt. no. 10] (respectively, "Answer" and "CC"); Answer to Counterclaim, dated Apr. 17, 2014 [dkt. no. 11] ("Answer to CC").

[2] Adjmi claims that "Theatre Communications Group ("TCG") has proposed publishing 3C in book form as part of a volume of Adjmi's works.  In addition, Samuel French, Inc. has proposed

2

DLT, for its part, has refused to reconsider its initial position and continues to assert that 3C infringes upon its copyright in Three's Company.  (FAC ¶ 68; Answer ¶ 68.)  This position presents a de facto roadblock to future publication or production of 3C, which Admji now seeks to remove.

To that end, on January 30, 2014, Adjmi filed the Complaint against DLT, seeking a declaratory judgment that 3C does not infringe upon DLT's copyright in Three's Company. Thereafter, Adjmi filed the First Amended Complaint, and DLT filed its Answer.  DLT's Answer asserts counterclaims (the "Counterclaims") on behalf of DLT and Three's Company (together, the "Joint Venture") for copyright infringement against Adjmi and the Production Companies.[3]  Adjmi, in turn, denies those claims in his Answer to the Counterclaims.

---

publishing the acting edition of the play, publishing the play as an e-book, and handling stock and amateur licensing for English-language productions of the play worldwide."  (FAC ¶ 67.)  DLT is "without knowledge or information sufficient to form a belief as to the truth of [those] allegations ... and therefore denies" them.  (Answer ¶ 67.)  Given that 3C's Off Broadway run is over, the Court assumes there would be no live controversy if not for the potential future publication and production of 3C.

[3] The Production Companies were served on or about June 9, 2014 (see [dkt. no. 25]) and answered the Counterclaims, denying liability, on July 17, 2014 (see Answer of [Production Companies], dated July 17, 2014 [dkt. no. 30]).

On August 24, 2014, Adjmi moved for judgment on the pleadings. (Motion for Judgment on the Pleadings, dated Aug. 25, 2014 [dkt. no. 34] (the "Motion").) A few days later, on August 28, 2014, Adjmi also moved for a stay of discovery pending the disposition of the earlier Motion. (Motion to Stay Discovery, dated Aug. 28, 2014 [dkt. no. 38] ("Discovery Motion").)[4] Following briefing and oral argument, United States District Judge Thomas P. Griesa GRANTED Admji's Discovery Motion. (See Order, dated Oct. 2, 2014 [dkt. no. 47].) Accordingly, DLT[5] and Adjmi[6] then proceeded to complete briefing the present Motion.

---

[4] See also Plaintiff/Counter-Defendants' Memorandum of Law in Support of Motion for Judgment on the Pleadings, dated Aug. 25, 2014 [dkt. no. 35] ("Pl.'s Memo").

[5] See Memorandum of Law in Opposition to Plaintiff/Counter-Defendants' Motion for Judgment on the Pleadings, dated Oct. 28, 2014 [dkt. no. 53] ("Defs.' Memo"); Declaration of Michael E. Sander, dated Oct. 28, 2014 [dkt. no. 54] ("Sander Decl."); Declaration of Michelle Mancino March, dated Oct. 28, 2014 [dkt. no. 55] ("Marsh Decl.").

[6] Reply Memorandum of Law, dated Nov. 14, 2014 [dkt. no. 58], and Amended Reply Memorandum of Law, dated Nov. 19, 2014 [dkt. no. 61] (together with Reply Memorandum of Law, "Pl.'s Reply").

II.  THE PLEADINGS

          The Court's recitation of the facts and allegations is drawn from the pleadings and the exhibits incorporated therein. As described in detail below, the standard of review for a 12(c) motion requires that all pleadings be taken to be true, but that any inconsistencies between the allegations in the pleadings be resolved in favor of the non-moving party, here DLT.  However, this does not require the court to accept legal conclusions or characterizations in DLT's pleadings.  (See infra III.A.)

          The pleadings—specifically the Complaint, Answer, Counterclaims, and Answer to the Counterclaims—present different conceptions of Three's Company and 3C.  Rather than classify each claim and counterclaim as either a legal conclusion or characterization or, in the alternative, a non-conclusory statement with basis in fact, the Court relies on the underlying source material: nine seasons of Three's Company and the screenplay (and certain reviews) of 3C, each incorporated by reference in the pleadings.[7]  II.A and II.B supply brief backgrounds of Three's Company and 3C, respectively, before presenting a more detailed account of the two works.

---

[7] See Declaration of Camille Calman, dated Aug. 25, 2014 [dkt. no. 36] ("Calman Decl." or "DVDs"); FAC Ex. A ("3C" or "the Screenplay").

A. Three's Company

Three's Company was one of the most popular television shows of the 1970's. (FAC ¶ 17; Answer ¶ 17.)  From its debut in the spring of 1977 to its final season in 1984, the series was almost continuously among the top ten shows according to the Nielsen ratings, attaining the top spot in the 1978-1979 season. (FAC ¶ 17; Answer ¶ 17.)  Three's Company was a situation comedy that revolved around three single roommates sharing an apartment in Santa Monica, California.  (FAC ¶ 18; Answer ¶ 18.)  As described on the cover of the Season One DVD:

> John Ritter stars as Jack Tripper ... the ever-bumbling bachelor who shares an apartment with down-to-earth Janet Wood (Joyce DeWitt) and dim-bulb blonde Chrissy Snow (Suzanne Somers).  Along with their sexually frustrated landlords the Ropers ... and Jack's fast-talking pal Larry ... these three outrageous roommates tripped and jiggled through a world of slapstick pratfalls, sexy misunderstandings and some of the most scandalously titillating comedy America had ever seen.

(Season One DVD cover.)  The plot was based on a British situation comedy called Man About the House, which also featured three roommates, two female and one male, in which the male roommate pretended to be homosexual.  (FAC ¶ 19; Answer ¶ 19.)  And as in Man About the House, the male roommate in Three's Company—Jack—pretends to be homosexual. (FAC ¶ 18; Answer ¶ 18.)  Three's Company was considered daring for its time, in that it featured three single,

opposite-sex adults platonically sharing an apartment in the late 1970s.  (FAC ¶ 20; Answer ¶ 20.)  Indeed, the issues tackled by Three's Company were revolutionary.  (FAC ¶ 25; Answer ¶ 25.)

Although the pleadings incorporate by reference all nine seasons of Three's Company, the parties explicitly reference seven episodes.[8]  Accordingly, the Court focuses its analysis on those particular episodes in reviewing specific sequences referenced by the pleadings and in forming a general impression of Three's Company.

1. Season 1, Episode 1: A Man About the House

Three's Company's pilot episode, like each subsequent installment, opens with a montage: Jack rides his bicycle by the ocean before becoming distracted admiring a female passer-by and tumbling into the sand, grinning; Janet tends to her flowers then playfully pours water on a sun-bathing and scantily-clad Chrissy; all while the familiar chorus of "Come and Knock on My

---

[8] The First Amended Complaint cites Season 1, Episode 4 (¶ 21) and Season 4, Episode 9 (¶ 22).  The Counterclaims cite Season 1, Episode 1 (¶ 31(h)); Season 1, Episode 2 (¶ 31(m)); Season 2, Episode 3 (¶ 36); Season 2, Episode 6 (¶ 35); and Season 2, Episode 22 (¶ 37).  Adjmi's Answer to the Counterclaims cites Season 2, Episode 3 (¶ 25) and Season 2, Episode 22 (¶ 37) (both of which were cited in the Counterclaims).  The Court notes also that the Sander Declaration cites many episodes of Three's Company as part of a detailed comparison between the television series and 3C.  See Sander Decl. Ex. A.

Door"[9] plays in the background.  The whole sequence evinces a happy-go-lucky, carefree feel—an appropriate harbinger for the pilot episode and the series as a whole.

Following the lead-in, the show opens with Chrissy and Janet proverbially (and literally) picking up the pieces after hosting what appears to have been a rousing going-away party for their former roommate, Eleanor.  Janet incredulously asks Chrissy what the latter put in her mysteriously strong green punch, before bashfully asking "That awful girl at the party last night, the one giggling and trying to do a striptease ... that was me, wasn't it?"  The whole conversation is more palm-to-forehead funny than hand-in-head serious, replete with laugh track.

The coup de grace comes when the pair of roommates finds a strange man sleeping in the bathtub.  This, of course, starts in motion what becomes the central plot theme: an attractive, heterosexual man living with two attractive, heterosexual women in an entirely platonic—albeit innuendo-laden—manner.  The getting-to-know you segment includes Janet's

_____

[9] The full lyrics: "Come and knock on our door.  We've been waiting for you.  Where the kisses are hers and hers and his, three' company too ... Come and dance on our floor.  Take a step that is new.  We've a lovable space that needs your face, three's company too ... You'll see that life is a ball again and laughter is calling for you.  Down at our rendezvous, three is company, too."

approaching Jack, threatening him with a punch ladle (still green from Chrissy's punch concoction); the women's thawing a bit as they realize Jack mistakenly passed out in the tub; Jack and Chrissy's flirtatious bantering; and, finally, Jack's donning a woman's dress as the trio sits down for breakfast. Chrissy makes inedible toast ("It's not my fault, Eleanor didn't leave the recipe!") and eggs before Jack, who turns out to be a chef-in-training, reverses assumed 1970s gender roles by cooking breakfast himself.

While all this is happening upstairs, downstairs Mr. and Mrs. Roper play a familiar trope: curmudgeonly, stuck-in-his-ways old man and his sarcastic but ultimately loving wife. The ensuing exchange typifies the couple's repartee: Mrs. Roper responds to her husband's complaints about the prior night's noisy party by reminiscing about an earthquake "the first time our bed's moved in years," which draws an equally biting comment from Mr. Roper, "It's a shame you don't live in India, you'd be sacred there."

The remainder of the episode is a humorous lead-up to the Ropers' ultimately discovering that Jack, still wearing Eleanor's dress, intends to become Chrissy and Janet's third roommate.  Because the portrayal of Jack's sexuality is at

9

issue, it is helpful to provide a few examples representative of
Three's Company's treatment of that topic:

> JANET: (on Jack's appearance in Eleanor's dress) She
> looks dreadful without makeup.
>
> MR. ROPER: (on hearing there is a man in Chrissy and
> Janet's apartment) A man up there, in woman's clothes?
> Are you sure?  They all look alike nowadays!
>
> MRS. ROPER: (paraphrasing Mr. Roper) '[I] won't have
> any weirdoes or hanky panky in my house' ... he thinks
> Queen Victoria was a swinger!

Consistent with those reactions, the Ropers initially
prohibit Jack from living with Chrissy and Janet.  However, the
couple relents after Janet—with Jack and Chrissy in another
room—falsely tells the Ropers that Jack is, in fact, homosexual.
With the prospect of unwed "hanky panky" eliminated, Mr. Roper,
sporting a knowing smile, suddenly turns benevolent and consents
to Jack as Chrissy and Janet's roommate.  In response to Jack
and Chrissy's incredulity regarding Mr. Roper's sudden change of
heart, Janet explains, "Told him Jack was a decent, respectable,
hard-working man ... Also told him you were gay!" whereupon the
new roommates collapse in laughter.

With that summary of the pilot episode as background,
the Court now summarizes the other episodes cited in the
pleadings, with an eye toward matters in dispute.

2. Season 1, Episode 2: And Mother Makes Four

Episode Two, And Mother Makes Four, provides the first test for Jack's secret—that he is a heterosexual man posing as a homosexual one.  The challenge comes in the form of a visit from Chrissy's mother, Mrs. Snow.  Mr. and Mrs. Snow reside in Fresno, where Mr. Snow serves as a minister, and view Los Angeles as something approximating Sodom and Gomorrah. Accordingly, Chrissy, Janet, and Jack take great pains to prevent Mrs. Snow from learning that Jack is the new third roommate.  This involves Jack and Janet's vacating the apartment to join Mrs. Roper for a drink at the local bar where, after Jack leers at an attractive barmaid, Mrs. Roper guesses that Jack is in fact heterosexual and proceeds to make half-serious advances toward him.

The roommates wait for Mrs. Snow to fall asleep before sneaking into the apartment.  Mrs. Snow is sleeping in Jack's room and, in a series of slapstick maneuvers—posing as a lamp and hiding behind a mop, among others—Jack manages to evade her. Despite his efforts, Mrs. Snow ultimately recognizes Jack's name from the mailbox.  Rather than the expected shock and outrage that Jack is living with her daughter and Janet, Mrs. Snow instead says it is "such a relief to know that you have a man to protect you ... or in this case, someone like Jack."

11

Unbeknownst to the roommates, Mr. Roper had already filled in Mrs. Snow on Jack's "secret," in the harmless and innuendo-laden tone emblematic of the series.  Upon learning from Mrs. Snow that she is sleeping in "Eleanor's room," Mr. Roper smiles knowingly and says that the room is actually Jack's, noting that sleeping there is "safe enough" for Mrs. Snow but that she "wouldn't catch [Mr. Roper]" sleeping in there because he is "a decent, normal man."  Everyone laughs—some knowingly, others obliviously—before happily going to bed; except for Jack, who is left to the couch.

### 3. Season 1, Episode 4: No Children, No Dogs

Episode Four follows the same paradigm as Episode Two, but instead of hiding Jack from Mrs. Snow, this time the roommates hide a new puppy from Mr. Roper.  As the title suggests, Mr. Roper enforces a strict ban on dogs and babies. The dog storyline dovetails with another sub-plot: Chrissy's recent bout of sleepwalking.

The sleepwalking, Chrissy tells Janet, is induced by stress.  As a child, this was brought on by expectations associated with being a minister's daughter; but now it is the result of a "handsy" boss.  Chrissy's boss—whom the females at work call "Christopher Columbus" because of his proclivity to "explore" female subordinates with his hands—has been making

12

unwanted advances.  However, Chrissy has no recourse: she cannot complain to the boss because he is the boss.  As Chrissy and Janet ponder this quandary, Jack walks in with a new puppy.  All three are overcome by the puppy's cuteness; Chrissy and Janet's conversation falls by the wayside.

The puppy proves to be a source of comedy.  Chrissy and Jack engage in innocent banter while taking care of the puppy, which an eavesdropping Janet misinterprets as the two being engaged in sexual relations:

> JACK: Yeah, there's nothing a girl likes more than a little tickle on the tummy.
>
> CHRISSY: Not like that!  Like this.
>
> JACK: Yeah, is that better?
>
> CHRISSY: Ooooh, that is much better.
>
> JACK: You are soooo beautiful.  (Jack makes a kissing sound.)

(See also FAC ¶ 22.)  And later in the episode, following a series of comical misunderstandings, Mr. Roper inadvertently eats dog food—which draws even more laughs when he describes it as delicious.

In an effort to find a new home for the puppy, Chrissy leaves him on the Ropers' doorstep and, when spotted by Mrs. Roper, claims to have been sleepwalking.  As in each previous episode, everything ties together neatly and ends in laughter:

Mrs. Roper keeps the puppy as a twentieth anniversary gift from Mr. Roper, who had forgotten the anniversary and—as Mrs. Roper knows—had no role in delivering the dog to their doorstep.

### 4. Season 2, Episode 3: Janet's Promotion

Janet's Promotion features more serious subject-matter than Mr. Roper consuming dog food.  In this episode, Janet is passed over for a promotion by her inexperienced, but very attractive, new co-worker Chloe.  It turns out that the manager, Mr. Compton, promoted Chloe because of her striking figure, particularly, as the show emphasizes, her large bust.  This causes Janet to question how a woman can be taken seriously in the workplace, and even to consider, briefly, cosmetic surgery to enhance her bust.  At different points in the episode, both Janet and Chloe express sincere plight:

> CHLOE: Mr. Compton invited me over after work to go over some forms, and started with mine.  He didn't even ask.  When you're built like me, men just take it for granted you'll say yes.  I can't remember the last time a man looked at my eyes.

> JANET: When I started high school, I had absolutely no figure at all ... One day when teacher asked the class to locate the Great American Flatlands, every single boy pointed at me.

Despite some serious moments, Three's Company ultimately uses this issue to generate innuendo-fueled comedy. Jack tries to empathize with Janet but inserts his foot squarely

14

in mouth with an unfortunate pun, telling Janet "not to make mountains out of molehills."  Similarly, Jack begins to tell Chloe that he noticed her beautiful eyes but accidentally substitutes "eggs" for "eyes," a Freudian slip due to Chloe's large bust.  Per usual, the episode closes on a playful note: Jack mockingly accusing Chrissy and Janet of "undressing him with their eyes," whereupon they tear at Jack's clothes and he fends them off by pantomiming karate.

### 5. Season 2, Episode 6: Alone Together

Alone Together picks up on a familiar series theme: sexual tension between Chrissy and Jack.  With Mr. Roper out of town on business, Janet agrees to stay the night with Mrs. Roper—leaving Jack and Chrissy alone in the apartment.  Janet is concerned that things between her roommates might finally boil over and warns Chrissy not to give Jack "the wrong ideas ... or the right ideas ... or any ideas!"  Chrissy reluctantly takes Janet's advice and purposefully dresses conservatively (in a robe with curlers in her hair) for dinner with Jack.  Despite her efforts, however, the pair's eyes meet and the audience is led to believe that the two will sleep together.

Janet certainly shares that impression, bolstered by finding Chrissy depressed and Jack ebullient upon her return

from the Ropers'.  However, when Janet finally extracts the
story from Chrissy, it turns out the opposite is true:

> CHRISSY:  It's too humiliating.
>
> JANET:    Men can be beasts sometimes.
>
> CHRISSY:  We talked, and [Jack] kissed me on the
> forehead.
>
> JANET:    Before [sex] or after?
>
> CHRISSY:  (In dismay) ... instead of.

The joke is in the irony that Chrissy is upset because
Jack played against the common male stereotype by not taking a
pass at her.  This conundrum is solved by Jack "apologizing" to
Chrissy, telling her that, if single, he "would've thrown [her]
on the sofa, ripped off [her] clothes, and attacked [her] like a
mad dog!"  Chrissy feels much better knowing she has maintained
her "sex appeal."  The show concludes with one final twist: with
Mr. Roper's trip extended unexpectedly, Janet agrees to stay
with Mrs. Roper for two more nights, leaving a newly single Jack
and Chrissy alone.  The audience delights in the possibilities.

### 6. Season 2, Episode 22: Days of Beer and Weeds

Season 2, Episode 22 again features mistaken identity.
This time it is not Jack's sexuality; rather, it is a mysterious
plant Jack, Chrissy, and Janet find in the Ropers' "garden"
after Mr. Roper enlists the roommates to clean the yard because
Mrs. Roper has an amateur flower-arranging competition.  Their

humorous attempt to clear the garden (Jack: "There are pockets of Japanese in [here] who don't know the war is over!") features Jack sustaining all sorts of bug, hose, and hoe-induced injuries.  Despite these obstacles, the roommates ultimately find green wildflowers for Mrs. Roper—but the real comedy comes later, when Larry informs Jack and Chrissy that the green wildflowers are actually marijuana.

This revelation causes Chrissy and Jack to panic—should they burn the plants?  Leave them on the balcony for the neighbor's cat to eat?  Unable to settle on a solution, the pair visits the police station.  After a humorous back-and-forth with a police officer about Chrissy and Jack's hypothetical "friend" who may have committed an "offense," Chrissy blurts out that Jack has been drinking (a couple of Mr. Roper's homemade beers).  Jack is ultimately brow-beaten into taken a urine test and his bicycle is confiscated due to his "riding under the influence."  However, this misadventure ends like most in Three's Company: with non-serious consequences and a joke, as Jack is most concerned he will need to replace the tires and horn after the police ride his bike all around Los Angeles.

There is also the small matter that Mrs. Roper has included some of the "wildflowers" in her floral arrangement for the competition.  Realizing this, Chrissy calls Mr. Roper.  The

audience sees only his side of the telephone conversation: "Mrs.
Roper has a can of what?  A can of "bis"?  What's that?  Oh,
cannabis?  So?  What?  WHAT?  Mari ... shi ... I know it's
illegal!"  As the instructor approaches to judge Mrs. Roper's
arrangement, Mr. Roper destroys the arrangement to obscure the
"wildflower" which, no surprise, turns out not to be marijuana
after all—crisis averted.

### 7. Season 4, Episode 9: Chrissy's Hospitality

Chrissy's Hospitality opens with a scene hearkening
back to No Children, No Dogs, as Mr. Furley (Mr. Roper's
replacement) overhears Chrissy and Jack putting up a shower
curtain and mistakenly thinks they are engaged in sexual
relations:

> JACK: Okay, Chrissy, I'll get in the tub with you,
> then we can get it on.
>
> CHRISSY: Get next to me, I'll show you what to do.
>
> JACK: This isn't exactly the first time I've ever done
> this.
>
> CHRISSY: Maybe so, but girls are better at this than
> boys.
>
> JACK: Come on, Chrissy.  A little less talk and a
> little more action, okay?

(See also FAC ¶ 22.)  This innuendo is a recurring sub-plot
throughout the episode.

However, the episode revolves around Chrissy's trip to the hospital after an apparent head injury.  Jack and Janet are grief-stricken when told of the potential severity of Chrissy's injury and later come to believe that Chrissy's death is imminent.  Of course, things are not as they seem: the doctor had tears in his eyes not because Chrissy was ill, but because her ditziness caused him to laugh so hard he cried.  Instead of spending the night concerned about her apparent head injury, Chrissy tells the doctor she spent the evening marveling at God's practicality in making us: ears for hearing, but also in the perfect place to hold up glasses; ten fingers is the perfect amount for counting; arms on top of hands so (as she pantomimes a tyrannosaurus-rex) we can scratch our backs.  Chrissy's bubble-headedness stands in sharp relief to Jack and Janet's prayers for God to help Chrissy.  As usual, everyone goes home happy—and to a blaring laugh track.

B. <u>3C</u>

<u>3C</u> is a play authored by American playwright David
Adjmi.  In summer 2012, it was produced for a limited run at
Rattlestick, Off Broadway.  (FAC ¶ 60, Ex. C; Answer ¶ 61.)  The
parties agree that <u>3C</u> copies the plot premise, characters, sets,
and certain scenes from <u>Three's Company</u>.  (FAC ¶ 35; Answer
¶ 35.)  More specifically, as in <u>Three's Company</u>, <u>3C</u>'s lead male
character is an aspiring chef; the blonde female lead is the
daughter of a minister; and the brunette female lead is a
florist.  (<u>Id.</u>)  However, the parties agree on little else
regarding the extent to which <u>3C</u> copies <u>Three's Company</u> and in
characterizing the comparison between the two.  As in its review
of <u>Three's Company</u> episodes, the Court focuses on <u>3C</u>'s
screenplay, incorporated by reference in the pleadings.

<u>3C</u> begins with two excerpts, the former from William
Shakespeare's *Romeo and Juliet* and the latter from *Genesis* 3:17:

> These violent delights have violent ends,
> And in their triumph die, like fire and powder,
> Which as they kiss consume.
>
> Cursed is the ground for your sake;
> In toil you shall eat of it
> All the days of your life.

(4.)[10]  This is an apposite preamble for the play.

---

[10] All quotations in this section are from <u>3C</u>, therefore only the
page number is listed (or <u>id.</u>, as appropriate).

<u>3C</u> assumes a heavy tone from the outset.  The first scene finds Linda and Connie hung over from the previous night's going-away party for their departed roommate, Beverly. Following a quick exchange, the dialogue opens with Connie reading from "<u>Cosmo</u>" magazine:

> CONNIE: This lady was disfigured cause she burnt her bra.  The whole house burned down, now the insurance people are after her ... People lead such interesting lives.

(5.)  After Linda dismisses the story ("It's called saving money"), Connie mentions that her father is a minister, musing "We're all fallen//."[11]  (<u>Id.</u>)  After Connie's sobering observation, the roommates touch on a variety of topics in short order: money problems ("LINDA: We can't afford a vacation; we can barely make rent."); self-consciousness bordering on self-loathing ("LINDA: I need to lose weight first ... I can't date anyone looking like

---

[11] <u>3C</u> uses certain writing devices and abbreviations in crafting dialogue.  "A double slash (//) indicates either an overlap or jump ... speech in parentheses indicates either a sidetracked thought or a footnote within a conversation, or shift in emphasis with NO transition ... A STOP is a pause followed either by a marked shift in tone or tempo (like a cinematic jumpcut or a quantum leap) or *no* change in tempo whatsoever ... These moments in the play are less psychological than energetic. They have a kind of focused yet unpredictable stillness, something akin to Martial Arts, where there is preparedness in the silence ... ."  (<u>3C</u> at 3.)  In order to reflect the play as accurately as possible, the Court's quotations from <u>3C</u> appear exactly as they do in the screenplay.

this."); references to sexual assault ("LINDA: (*reacts*)
Don't you think it's dangerous to date strange men?
CONNIE: (*matter-of-factly*) If you flirt you flirt with
danger, I learned that the hard way. ... LINDA: Connie, you
don't even have a job.  CONNIE: (*hurt*) I had to quit, my
boss was hitting on me!"); and Connie's promiscuity
("CONNIE: Because he was having sex with me but she walked
in.")  (6-8.)  3C is not light fare.

Connie and Linda's conversation continues, touching
on the topics listed above, and others.  The following is
representative of their dialogue:

> LINDA: *And I'm not going out with anyone until I lose
> twenty pounds!! LEAVE ME ALONE.*  (11.)
>
> ⸺
>
> CONNIE (on her grandmother):  I gave her shots and
> things, she had diabetes. But then my mother refused
> to take care of her and we put her in a home. She died
> a few months later. I *never* forgave my mother. (*pause*)
> Well I forgave her but only years later, we *never*
> spoke again.  (12.)
>
> ⸺
>
> LINDA: I'm ugly and I look like a dyke!
> CONNIE: You are *not* a dyke.
> [PAUSE]
> LINDA: I know what people say about me //
> CONNIE: *What?*  People // don't—
> LINDA: (*hurt*) I know what people say.

(13.)  Suffice to say, the tone is not uplifting.  And the roommates' mood is further dampened by their landlord, Mr. Wicker, demanding rent they are unable to pay.  (15.)

Connie and Linda are eventually interrupted by Brad, who enters the room wearing nothing but a sock on his left foot.  (16.)  After the initial shock, the roommates realize that Brad attended their party, drank too much, and mistakenly passed out naked in the kitchen.  (17-18.)  The ensuing dialogue toggles between excitement and disarming seriousness; for example:

> BRAD: You two have a lot of energy.
> LINDA: WE get excited having company over.
> CONNIE: Unless they're rapists.

The conversation then morphs into Brad, Connie, and Linda's dancing, which "escalates until it is almost a competition, a bacchanal" and is "both enjoyable and a little insane."  (22.)

This sort of dialogue, sometimes disjointed and rapidly shifting in tone and topic, is a hallmark of 3C.  For example, almost as soon as the dancing concludes, Connie accuses Brad of looking at her breasts and asks "Am I just breasts to you?"  (23.)  Just as quickly, however, the conversation—and Connie—changes completely:

BRAD: I'm from Kansas. I got out of Vietnam about a
year ago.

LINDA: (*delicately*) Oh...

BRAD: I've been floating around a little bit.

CONNIE: (*cheerful*) I've never been to Vietnam, was it
nice?

(Id. at 23.)  And so it continues, touching on Brad's

aspirations to be a chef, followed shortly thereafter by

more self-loathing weight-related comments from Linda.

Eventually, the trio broaches the topic of Brad

replacing Beverly as Linda and Connie's third roommate.

Although the women consent to the arrangement relatively

quickly, the discussion evokes a concerned threat from Connie

("CONNIE: (*worried*) You're not gonna try to get it on with me

are you?  because I was almost raped in Venice Beach once // ...

(*to Brad, a threat*) I took classes in La Jolla, I could knife

you.") and not much in the way of hospitality:

BRAD: So... we're *roommates*?

LINDA: That's your room There's a bed and a dresser //

CONNIE: We're not giving you a blanket or sheets You
need your own.

BRAD: How much is rent? //

CONNIE: Eighty one dollars and you owe from last month
too so can you pay that?

(25-26.)  The discussion halts when the roommates realize Mrs.

Wicker, the landlord, is knocking at the door—which leads Brad

to hide in the bedroom, where Connie joins him only after grabbing a knife for protection.  (27.)

Linda and Mrs. Wicker's dialogue is similar to the earlier conversation between Connie and Linda: moments of compassion interrupted by often manic outbursts, along with philosophical musings sprinkled throughout.  Here, this rhythm plays out during a discussion about shower Mrs. Wicker is charged with throwing for her niece.

> MRS. WICKER: (*casual at first, then increasingly terrified and real*): It's just I'm anxious *all* the time and not just about my niece's party although I'm scared to call the person to do the calligraphy for the invitations?
>
> ...
>
> LINDA: Why are you // so anxious?
>
> MRS. WICKER: OW I burnt my tongue! Ha ha ha (*austere*) but no I'm just *anxious* all the time (*jovial*) hey did you guys paint in here?
>
> ...
>
> MRS WICKER: Some people think there are four dimensions or five or an infinite amount of dimensions And some people think we live inside a hologram *That makes me anxious*!
>
> LINDA: Have you ever considered medication? //
>
> ...
>
> MRS. WICKER [*simmering*] No-I-said-I-never-*considered*-it-which-is-true-because-it-was-prescribed-for-me-and-I-don't-TAKE-IT!
>
> [STOP]

(30-31.)  This segment discussing Mrs. Wicker's anxiety continues until Linda and Mrs. Wicker overhear what sounds like,

without additional context, Brad and Connie engaging in sexual
relations.  (33-34.)  Despite Linda's efforts, Mrs. Wicker
ultimately discovers Brad, dressed in a ladies' nightgown,
whereupon Linda tells Mrs. Wicker that Brad is a transvestite.
(Id. at 35.)  After some deep thoughts about transvestites and
make-believe, Mrs. Wicker finally relents to Brad's becoming the
third roommate because, as Connie says, "He's gay. That's
practically a woman!"  (36.)  Despite consistently referring to
Brad, and homosexuals in general, as "faggots," Mrs. Wicker
consents to the new living arrangement and appears to be too
caught up in her own anxiety to care: "MRS WICKER: (weirdly
flirtatious) Don't tease! and anyways, I plan on committing
suicide in a few days, so I'll be dead first. Ha ha ha. LADIES
FIRST. No seriously, I want to die. NO I'M KIDDING.  (her smile
disintegrating here) ... ."  (39.)  Mr. Wicker's attitude toward
homosexuals is much more direct.  He derides Jack ("If you could
only get pregnant I'd have you in my kitchen in no time.") and
tells a variety of unsavory jokes throughout 3C (e.g., "WICKER:
Hey, how do you fit four fags on a barstool? ... Flip it over!
Ha ha ha ha.").  (40-41.)  In addition to his prejudicial views
and overall repulsive character, Mr. Wicker also appears to have
had an illicit—and not necessarily consensual—relationship with
Linda.  At one point, he sexually assaults her, sticking his
hand down her pants despite her protestations.  (41.)

Mr. Wicker is not the only character who uses derogatory language for homosexuals and has an aggressive, abusive attitude toward women. Brad's friend, Terry, engages in similar behavior. After learning that the Wickers are under the impression that Brad is homosexual, which Terry believes to be false, he attempts to joke with Brad: "Don't tell me you're getting all sensitive on me, witcha new "lifestyle:? Huh faggot? HA HA HA. ... *Brad smacks Terry on the ass ...* (*mock eroticism*) Yeah you like that you little faggot huh? You like it when I slap your ass? HEH HEH HEH." (46.) This dialogue breaks up Terry's continuous boasting about his conquests ("TERRY: I stuffed a sock in her mouth to shut her up but then she got it all foamy and had some kinda seizure"). Brad repeatedly declines to join in, which the audience learns is because he is actually homosexual and harbors romantic feelings for Terry.

The play continues, building on established themes: Linda's negative self-image ("*She opens her eyes, sees her reflection in the mirror. Oops, she's 'fat and ugly' – remember, Linda? Her smile crumples*") (52); Brad's closeted attraction to Terry, and Terry's exacerbating that with his abrasive obliviousness (to Brad: "TERRY: You're such a little *faggot* [*slaps his knee, as if speaking to a dog*] 'Cmere faggot'") (49); and Connie's obviously complicated religious and

familial history ("I'm very religious. Where's my rosary? Oh it doesn't matter, I think the beads all fell off. I don't think I really believe in anything anymore frankly.") (54); and Connie's promiscuity, after she agrees to go to a Peter Frampton concern with a man she just met. (55.)

Even 3C's relatively happier moments are accompanied by complicated, dark undertones. As Linda and Brad engage in a game called "faces," whereby one player tells the other a "face"—happy, sad, excited, and so on—to make, the game increases in intensity and has an undercurrent approaching mania. (59-63.) The game ends after Connie tells Linda to do "anguish with an undercurrent of sexiness" which is described as follows: "*It's real anguish. She brings in the erotic longing. It's very painful ... it's uncomfortable for everyone ... She immediately bursts into tears*." (63.) The game ends with Linda wrapped in Connie's arms.

After Linda exits, Terry returns. This time, however, he is more interested in Connie than Brad. After a lewd sexual joke and gesture at Connie's expense ("CONNIE: I feel like having pancakes I wonder if there's any batter left? // TERRY: You want batter? I got batter for you right here, baby // *Terry gets behind her, pulls her to him. She pushes him away*."), Connie orders Terry to go but changes her mind when Terry tells her he has acquired drugs. (65.) The two go into Connie's

28

bedroom.   Upon Linda's return, she hears them speaking and
initially believes Connie and Terry are sexually engaged—as it
turns out, he was forcing her to snort cocaine.   (67.)   Terry
subsequently disappears; Connie is manic and unreceptive to
Linda's soothing.

Linda is herself understandably shaken and,
impulsively accosts Brad—"LINDA: (in tears, blurts) You can't
just shove your thing into any hole you want!   Some holes aren't
meant for that and I think it's – disgusting."   (68.)   Brad is
taken aback, and even more so once Linda accuses him of hiding
something.   Although Linda is referring to Brad's hiding
relationships with women, the audience comes to realize that
Brad's secret is the opposite: that he is homosexual. ("BRAD:
(deeply pained) I tried to fix myself but I can't. (a quiet
admission:) Sometimes I don't even want to live anymore.)"
(70.)   The two continue talking past one another, as Brad
attempts to come out but Linda unknowingly rejects him.   A
"coked up" Connie then has a similar conversation with Brad,
asking "(gingerly) Brad?   Why do you always keep falling?   Is
there some insupportable weight you're carrying?   I mean ...
inside?" also without realizing that Brad's weight is his
closeted homosexuality.   (72.)   It is a confusing state of
affairs: Connie, Linda, and Terry believe Brad is a heterosexual

pretending to be homosexual to appease the Ropers, who think he
is homosexual.

After another bout of anxiety from Mrs. Roper, Jack's
sexuality comes into sharp focus.  Mr. Wicker makes a number of
comments about Brad's homosexuality; those below are
representative:

> MR WICKER: Hey did you hear what the faggot said to
> the other faggot in the bar as he passed by?  ... 'Can
> I push your *stool* in for you?"
>
> MR WICKER: [*smiles*] you don't mind me takin the piss
> out of you Brad. ... Cause if you do I'll *beat ya*
> *fuckin head in ya faggot!!* [beat] HA HA HA ... .

(85.)  Indeed, Mr. Wicker only relents after Brad begins telling
jokes deriding homosexuals himself.

After the Wickers depart, Brad, Connie, and Linda
return to their common refrains: negative self-conception,
inability to pay rent, and promiscuity, among others.  However,
despite their many issues—internal and external—Brad, Connie,
and Linda agree to "really be a *family*" and begin to play faces.
(90.)  From there, the dialogue jumps from topic-to-topic so
suddenly and inconsistently that Brad, Connie, and Linda are no
longer holding a conversation; rather, the play transitions into
a series of disjointed non-sequiters elaborating on themes
described above.

In the final scene, Brad finally attempts to "come
out" to Terry.  Terry is again deriding Brad for what Terry

30

incorrectly believes is Brad's false homosexuality when Brad

finally snaps:

>TERRY: "C'mon faggot!"
>
>BRAD: (*plainly*) I am a faggot.
>
>*Terry's expression slowly changes.*
>
>TERRY: What?
>
>*Brad looks at him. He looks like he could cry. He's shuddering. He can barely breathe.*
>
>TERRY: Dude, what the fuck's your problem?
>
>BRAD: (*hoarsely*) I... I ... love you.
>
>[PAUSE]
>
>TERRY: (*confused*) You— ?
>
>*Brad bursts into anguished, racking sobs.  He sobs and sobs and they just stare at him, blankly.*
>
>*His sobs transmogrify into laughter.  The laughter builds, becomes hysterical.  It's a little too hysterical.  Connie starts to laugh with him.*
>
>CONNIE: (*trying to be funny*) I'm a faggot too!

(96-97.)  Connie's joke sets off a chorus, as Linda and

Terry happily declare they are also "faggots," and Connie,

to great laughter, claims that BOB HOPE is also.  But:

>*Eventually, Brad stops laughing. He pulls himself off the floor.  The rest of them are still going.  Brad, unsmiling, wipes the tears from his eyes. He sits on a chair. Removed, but not too deliberately. The laughter dies down.*
>
>*As they recover a disquieting, awful dread creeps into the room.*
>
>*Silence.*
>
>*Black.* (98.)

31

III. DISCUSSION

A. A Declaratory Judgment on the Pleadings is Appropriate

To prevail on a Fed. R. Civ. P. ("Rule") 12(c) motion a plaintiff must plead sufficient facts to state a claim for relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In deciding such a motion, a court must accept as true the facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, and may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. Effie Film, LLC v. Gregory Murphy, 932 F.Supp.2d 538, 552-53 (S.D.N.Y. 2013), aff'd, 564 Fed.Appx. 631 (2d Cir. 2014) (internal citations omitted) (citing ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007)).

However, this case features a twist on a standard Rule 12(c) motion. "Because this is an action for a declaratory judgment of non-infringement, plaintiff's burden on this motion is turned on its head." Effie Film, 932 F.Supp.2d at 552-53. Adjmi may prevail on his Rule 12(c) motion only if the pleadings establish that there can be no set of facts to support an action for copyright infringement by DLT against Adjmi as a would-be defendant—or, put differently, that a hypothetical inverse Rule

32

12(c) motion by DLT and the JV against Adjmi and the Production
Companies would fail.  In deciding this motion, the pleadings—
Adjmi's Complaint and First Amended Complaint, DLT's Answer and
Counterclaim, and Adjmi's Answer to the Counterclaim—are all
taken to be true.  While any inconsistencies between the
allegations in the pleadings must be resolved in the non-moving
party's, here DLT's, favor, see, e.g., id. at 553, the Court
need not accept legal conclusions or characterizations contained
in DLT's pleadings.  State of N.Y. v. Oneida Indian Nation of
N.Y., No. 95-CV-0554 (LEK/RFT), 2007 WL 2287878, at *3 (N.D.N.Y.
Aug. 7, 2007).

     In evaluating a motion on the pleadings according to
this standard, a court may rely on the pleadings and all
exhibits attached to them.  See L-7 Designs Inc. v. Old Navy
LLC, 647 F.3d 419, 421-22 (2d Cir. 2011).  More specifically,
the court's scope of review includes "the complaint, the answer,
any written documents attached to them, and any matter of which
the court can take judicial notice for the factual background of
the case."  Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir.
2009).  And in that context, "[the] complaint ... is deemed to
include any written instrument attached to it as an exhibit,
materials incorporated in it by reference, and documents that,
although not incorporated by reference, are 'integral' to the
complaint."  Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004)

(citations omitted) (quoting Chambers v. Time Warner, Inc., 282
F.3d 147, 153 (2d Cir. 2002).   Here, although the Court is
entitled to rely on the broad definition of "complaint" above—
and even certain materials beyond that—this Memorandum and Order
is almost exclusively based on the DVDs of Three's Company and
the 3C screenplay, each expressly incorporated by reference in
the pleadings.[12]   Put differently: the Court's decision is
predicated on its review of the raw materials, not the parties'
proverbial labels.

    Courts in this Circuit have resolved motions to
dismiss on fair use grounds in this way: comparing the original
work to an alleged parody, in light of applicable law.   See,
e.g., Blanch v. Koons, 467 F.3d 244, 249-50 (2d Cir. 2006)
(affirming the district court's grant of summary judgment on
fair use grounds where district court reached that conclusion by
comparing the original and potentially infringing paintings);
Leibovitz v. Paramount Pictures Corp., 137 F.3d 109 (2d Cir.
1998) (affirming district court's grant of summary judgment on
fair use grounds where district court reached that conclusion by

---

[12] The Court cites two contemporary reviews of 3C, incorporated
by reference as FAC Ex. B, in its discussion of 3C's effect on
the potential market for or value of Three's Company.   See infra
IV.B.4.   These reviews are part of the FAC and thus properly
within the Court's scope of review.   However, the Court notes
that the reviews are not necessary to its overall finding that
3C is a fair use of Three's Company.

comparing original photograph to potentially infringing advertisement); Arrow Prods., Ltd. v. The Weinstein Co., No. 13 Civ. 5488, 2014 WL 4211350, *5-11 (S.D.N.Y. Aug. 25, 2014) (finding fair use based on a review of, and subsequent comparison between, two films); Effie Film, 932 F.Supp. at 545-553 (granting motion on the pleadings based upon a detailed review of two screenplays depicting the same historical events).

The present case can be resolved using similar methodology. Here, the original work is nine seasons of Three's Company, and the infringing work/alleged parody is the screenplay of 3C; and the latter provides a more than adequate basis for comparison to the former. As recounted in the Court's summary of 3C above, and explained within the framework of the fair use analysis below, a recording of the play is not necessary to evaluate 3C's setting, style, pace, and tone. The screenplay itself, along with certain contemporary reviews as context, provide more than enough information to resolve Adjmi's motion on the pleadings under applicable copyright law. Accordingly, this motion need not be converted to a motion for summary judgment, and further discovery is unnecessary. Based upon the Court's review of the pleadings—specifically its detailed summaries of Three's Company and 3C—there can be no set of facts to support an action for copyright infringement by DLT against Adjmi. Id. at 552-53.

35

## B. 3C is a Parody and a Fair Use of Three's Company

A plaintiff must prove two elements to establish copyright infringement: ownership of a valid copyright and copying of original elements in the copyrighted work. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991). There is no question that DLT holds the copyright to Three's Company or that 3C copied original elements of the former. Accordingly, this inquiry focuses—as the parties recognize it should—on whether Adjmi's 3C is nonetheless a non-infringing "fair use" of Three's Company.

The animating principle of copyright law is the United States Constitution's directive "[t]o promote the Progress of Sciences and useful Arts ... ." U.S. Const., Art. I, § 8, cl. 8. In practice, achieving that goal is an exercise in balancing the grant of property rights that incentivizes creative work, and the corresponding limits on the ability of the community to draw upon those ideas. This Court, and the Court of Appeals in which it sits, has frequently been an arena for that underlying tug-of-war. See, e.g., Cariou v. Prince, 714 F.3d 694, 705 (2d Cir. 2013); Blanch v. Koons, 467 F.3d at 250-51.

It is no coincidence, then, that the most widely cited statement summarizing this tension was authored by Judge Pierre N. Leval, currently sitting on the Court of Appeals, when he was

36

a district judge on this Court.  See Pierre N. Leval, Toward a Fair Use Standard, 103 HARV. L. REV. 1105 (1990) ("Leval").  "The copyright law embodies a recognition that creative intellectual activity is vital to the well-being of society.  It is a pragmatic measure by which society confers a monopoly ... in order to obtain for itself the intellectual and practical enrichment that results from creative endeavors."  Id. at 1109.  Even so, copyright law "depends equally on the recognition that the monopoly must have limits."  Id. at 1136.  Courts have developed a number of doctrines in an attempt to delineate where monopoly ends and new creations begin.

Perhaps the most well-known of these is the fair use doctrine, "which protects secondary creativity as a legitimate concern of the copyright."  Id. at 1110.  This general guideline was codified by Section 107 Copyright Act of 1976, which lists four non-exclusive factors that courts must consider in determining fair use.  17 U.S.C. § 107 (WL 2015) ("Section 107").  Under the statute:

> [T]he fair use of a copyrighted work ... for purposes
> such as criticism, comment, news reporting, teaching
> (to include multiple copies for classroom use),
> scholarship, or research, is not an infringement of
> copyright.  In determining whether the use made of a
> work in any particular case is a fair use the factors
> to be considered shall include—

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  As indicated by the framework and substance of the statute, the fair use determination was conceived—like copyright itself—as part art, part science.

The Supreme Court's definitive statement on the fair use doctrine, Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994), emphasizes the ad hoc nature of the inquiry. Determining whether the fair use defense applies "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." Campbell, 510 U.S. at 577 (citing Harper & Row, Publishers, Inc. v. Nation Enter., 471 U.S. 539, 560 (1985)).  Each of the four factors is "to be explored, and the results weighed together in light of the purposes of copyright." Id. at 577-78.  Section 107 is therefore not so much an independent framework for evaluation as a reflection of time-worn copyright principles. See, e.g., Folsom v. Marsh, 9 F.Cas. 342 (No. 4,901) (CCD Mass. 1841) (Story, J.) (In evaluating copyright infringement, courts

should "look to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede the objects, of the original work."). Put differently: fair use may be governed by statute, but it is still very much judge-made common law. Fortunately, from Justice Story, see Folsom, 9 F.Cas. (1841), to Judge Leval, see, Leval, to the present, judges have given content to the fair use standard by applying Section 107 in light of the underlying purposes of copyright. With this brief summary of the basic goals of copyright in tow, and the descriptions of Three's Company and 3C above, the Court now analyzes Three's Company and 3C under Section 107's rubric.

### 1. The Purpose and Character of the Use

The first fair use factor examines the purpose and character of the allegedly infringing work. Beginning with the most basic part of the inquiry, 3C is undoubtedly a commercial product. Even assuming arguendo that 3C's primary aim is art and not profit, the work qualifies as commercial under the law because "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471

U.S. at 562.  Adjmi seeks declaratory judgment specifically so that 3C can be published and licensed for possible future production.  3C's commercial nature therefore weighs against a finding of fair use.

However, the remainder of the "purposes and character" analysis points in the opposite direction.  "[T]he central purpose of this investigation is to see ... whether the new work merely 'supersede[s] the objects' of the original ... or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message ... ."  Campbell, 510 U.S. at 579; see also Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 141 (2d Cir. 1998).  Courts refer to this property by the shorthand "transformative."  See, e.g., Campbell, 510 U.S. at 579 (citing Leval, at 1111).  Transformative use is neither a sufficient nor exclusive means to establish fair use, but "[s]uch works ... lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright ... and the more transformative the new work," the greater the likelihood of a finding of fair use.  Id.  This is in keeping with the general calculus of copyright law: promoting the arts and sciences by rewarding ingenuity, without stifling creativity.

One type of protected creativity is parody, a
recognized category of criticism or comment authorized by
Section 107.  Campbell, 510 U.S. at 579.  Drawing from case law,
historical and dictionary meaning, as well as Congressional
intent, the Supreme Court found that "the heart of any
parodist's claim ... is the use of some elements of a prior
author's composition to create a new one that, at least in part,
comments on that author's works."  Id. at 580.  As demonstrated
by Campbell's predecessors and its progeny, the law is agnostic
regarding preference between original work and adaptation.
"Accordingly, parody, like any other use, has to work its way
through the relevant factors, and be judged case by case, in
light of the ends of copyright law."  Id.

3C uses the raw material of Three's Company "in the
creation of new information, new aesthetics, new insights and
understandings" and is "the very type of activity that the fair
use doctrine intends to protect for the enrichment of society."
Castle Rock, 150 F.3d 142 (quoting Leval, at 1111).  There is no
question that 3C copies the plot premise, characters, sets, and
certain scenes from Three's Company. (FAC ¶ 35; Answer ¶ 35.)
But it is well recognized that "[p]arody needs to mimic an
original to make its point, and so has some claim to use the
creation of its victim's ... imagination."  Campbell, 510 U.S.
at 581.  The "purpose and character" analysis assumes that the

41

alleged parody will take from the original; the pertinent inquiry is how the alleged parody uses that original material.

Despite the many similarities between the two, 3C is clearly a transformative use of Three's Company. 3C conjures up Three's Company by way of familiar character elements, settings, and plot themes, and uses them to turn Three's Company's sunny 1970s Santa Monica into an upside-down, dark version of itself. DLT may not like that transformation, but it is a transformation nonetheless.

DLT argues that 3C represents only "minor extensions ... of preexisting themes in Three's Company ... ." (Defs.' Memo at 22-23.) In support of this proposition, DLT points to language in Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1279 (11th Cir. 2001). In that case, the Court of Appeals for the Eleventh Circuit found a parody of Gone With The Wind to be a fair use, but warned that a hypothetical work which "do[es] no more than put a new gloss on the familiar tale without criticizing or commenting on its fundamental theme and spirit" would have made a finding of fair use more "much tougher." Id. DLT also points to a case in this Circuit, Salinger v. Colting, for the same "gloss" idea (see Defs.' Memo at 22-23), and as support for the general argument that "[i]t is hardly parodic to repeat [the] same exercise in contrast, just because society and

42

the characters have aged." Salinger v. Colting, 641 F.Supp.2d
250 (S.D.N.Y. 2009), vacated on other grounds, 607 F.3d 68 (2d
Cir. 2010).  DLT assumes that line of argument, asserting that
"all of the allegedly critical elements in 3C were in Three's
Company," including "sexual aggression, drug use, homophobia,
self-consciousness and self-esteem issues."  (Defs.' Memo at
18.)

However, 3C is hardly a "repeat" of Three's Company;
it is a deconstruction of it.  The former has turned the latter
into a nightmarish version of itself, using the familiar Three's
Company construct as a vehicle to criticize and comment on the
original's light-hearted, sometimes superficial, treatment of
certain topics and phenomena.  Take first the cornerstone of
Three's Company, Jack's false homosexuality: there is the
obvious difference that 3C's analogue, Brad, is actually
homosexual.  That change in itself might not be transformative.
However, Brad is a far cry from Jack—the former is almost a
reimagining of what Jack would have actually experienced if he
were homosexual: the abusive, demeaning treatment from Mr.
Wicker; constant homosexual slurs from Larry; and even rejection
from his own family.  This is a major departure from Mr. Roper's
innuendo-laden jokes.  Putting aside how the other characters
view Brad, and how that differs markedly from Jack's treatment
in Three's Company, there is also the stark contrast between

Brad and Jack themselves.  The two are tall, handsome men prone to occasional physical clumsiness, and both find themselves in similar living situations.  But that is where the similarities end.  Jack spends most episodes bantering with Chrissy, tripping on garden hoses, and serving as a general source of comedy; Brad, on the other hand, spends almost the entirety of 3C grappling with his secret—different from Jack's "secret"—and unsuccessfully attempting to make it known to Connie, Linda, and Larry.  Three's Company may have been ground-breaking and heralded in retrospect for raising homosexuality as a theme, but 3C criticizes the happy-go-lucky treatment of that issue.

The same is true for other topics DLT claims were already present in Three's Company and merely glossed over: Chrissy, Jack, and Janet's unwittingly finding a plant they erroneously believe to be marijuana versus Larry's forcing Connie to snort cocaine; Mrs. Roper's sarcastic sexual frustration versus Mrs. Wicker's near-psychotic break over planning a shower for her niece; the laugh-track blaring because Janet's classmates made fun of her flat-chestedness versus Linda's constant self-loathing; Chloe and Janet's commentary about a handsy male boss versus Chrissy's constant allusions to having been raped; and so forth.  To the extent that homophobia, sexual aggression, drug use, self-consciousness, and self-esteem issues were present in Three's Company—which the Court does not

necessarily accept as fact—those themes were largely made light of and ultimately played for laughs.  Moreover, many of those constructs, such as actual homosexuality and illicit drug use, were not actually present in Three's Company.  3C treats them as real and, in the Court's view, criticizes and comments upon Three's Company by reimagining a familiar setting in a darker, exceedingly vulgar manner.

Further discovery is likewise unnecessary to evaluate stylistic factors like setting, costume, style, pace, and tone. Given the overwhelmingly transformative nature of the substance, the first factor would likely weigh in favor of a finding of fair use even if certain elements, like setting, costume, style, and pace, were exactly the same as in Three's Company.  But that is not the case, particularly as it relates to the one DLT argues is most important: tone.  (See Defs.' Memo at 28.)  There is ample evidence to discern the tone of Three's Company.  It can be described as a happy, light-hearted, run-of-the-mill, sometimes almost slapstick situation comedy.  Each episode has a central "problem" which is solved by the end.  And the characters communicate regularly; supplemented, of course, by a laugh track.  (See, e.g., II.A.)  3C's markedly different tone is evident from even a cursory reading of the screenplay. Rather than a happy montage featuring bike-riding, watering flowers, and sunbathing, 3C opens with two morbid quotations.

As demonstrated by select quotations in II.B, 3C proceeds in a frenetic, disjointed, and sometimes philosophical tone.  It is often difficult to follow and unrelentingly vulgar.  The same could not be said of any episode of Three's Company. Accordingly, the Court does not take a position on the relevancy of further discovery; it simply finds such testimony is not necessary to determine that 3C is a highly transformative parody of Three's Company.[13]  This determination weighs heavily in favor of a finding of fair use.

### 2. The Nature of the Copyrighted Work

The second statutory factor, "the nature of the copyrighted work," Section 107(b), focuses on the "value of the materials used."  Campbell, 510 U.S. at 586 (quoting Folsom, 9 F.Cas. at 348).  "[This prong] represents an acknowledgment that certain works are closer to the heart of copyright than others; fair use is therefore more difficult to establish when a core work is copied than when an infringer takes material that falls only marginally within copyright protection."  Leibovitz v.

---

[13] In making this determination, the Court notes that it does not rely on reviews, user comments related to online reviews, images of the play, or certain of Mr. Adjmi's statements regarding the 3C.  Along the same lines, the Court does not require "intent" evidence, purporting to explain the aims and goals animating Three's Company and 3C, of the type cited by the Court of Appeals in Blanch, 467 F.3d at 252-55 or Cariou, 714 F.3d at 707.

Paramount Pictures Corp., 948 F.Supp. 1214, 1217 (S.D.N.Y. 1996), aff'd, 137 F.3d 109 (2d Cir. 1998). See, e.g., Stewart v. Abend, 495 U.S. 207, 237-38 (1990) (contrasting a fictional short story with factual works); Harper & Row, 471 U.S. at 563-64 (contrasting forthcoming memoir with published speech); Feist, 499 U.S. at 348-51 (contrasting creative works with bare factual compilations).

Three's Company is certainly a creative, even groundbreaking, work.  But that originality is less in the creation of new elements than in mixing familiar tropes together in novel ways.  A ditzy blonde (Chrissy), down-to-earth brunette (Janet), clumsy charmer (Jack), and old-generation landlords, among others, are stock characters to some extent.  Of course, it is unlikely Three's Company would have enjoyed such sustained success if the show were an unimaginative retread.  Even granting that this factor weighs somewhat against a finding of fair use, it nevertheless does little to sway the overall determination.  See Bill Graham Archives, LLC v. Dorling Kindersley Ltd., 386 F.Supp.2d 324, 330 (S.D.N.Y. 2005) (quoting Castle Rock, 150 F.3d at 144).  To quote the Supreme Court, the second factor is not "ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works."  Campbell, 510 U.S. at 586.  Accordingly, this factor

weighs in favor of DLT but assumes less importance in the
overall fair use analysis relative to the other three factors.

### 3. The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

The third fair use factor asks whether "the amount and
substantiality of the portion used in relation to the
copyrighted work as a whole," Section 107(3), are reasonable in
relation to the purpose of the copying.  Campbell, 510 U.S. at
586.  Much like the Section 107 analysis writ large, the third
factor is something of a sliding scale: the larger volume (or
the greater importance) of the original taken, the less likely
the taking will qualify as a fair use.  Leval, at 1122.  This
inquiry therefore takes into account the first and fourth
factors as well.  The appropriate level of taking, considered
both quantitatively and qualitatively, see Bill Graham Archives,
386 F.Supp.2d at 330, necessarily depends on the purpose and
character of the derivative use; and the facts relevant to the
third factor can also assist in the assessment of the parody's
effect on the market for the original.  See Campbell, 510 U.S.
at 586-87; Leval, at 1122.  Taking all this into consideration,
the Supreme Court provided a guidepost for the third factor
analysis: "[A] work composed primarily of an original,
particularly its heart, with little added or changed, is more

likely to be a merely superseding use, fulfilling demand for the original." Campbell, 510 U.S. at 587-88.

Applying this standard to parody is particularly difficult because of a simple reality: a parody's humor is entirely contingent on recognizable allusion to the original work. Id. at 588 ("[Parody's] art lies in the tension between a known original and its parodic twin."). So the inquiry seeks to draw a line between taking enough to evoke the original and excessive appropriation. The answer, of course, is that it depends on the particular facts. While the Supreme Court has recognized that "using some characteristic features cannot be avoided ... this is not ... to say that anyone who calls himself a parodist can skim the cream and get away scot free." Id. at 588-89. Even so, the Court of Appeals has consistently held that a parody under the fair use doctrine is entitled to more extensive use of the original work than is ordinarily allowed under the substantial similarity test. Rogers v. Koons, 960 F.2d 301, 310 (2d Cir. 1992); see also Elsmere Music, Inc. v. Nat'l Broad. Co., 623 F.2d 252, 253 (2d Cir. 1980) (per curiam).

3C copies extensively from Three's Company. (See generally, Sander Decl.) The parody takes the original's basic plotline, characters, and setting, and, to a lesser extent, its jokes and themes. See II.A; II.B. Adjmi argues that amount of

taking is consistent with other parodies that have qualified as
a fair use (see Pl.'s Memo, at 19); DLT, on the other hand,
alleges that 3C "pilfered" virtually every important element of
3C (see Defs.' Memo, at 26).   As for 3C's copying of the central
constructs of Three's Company, according to the Supreme Court
"[c]opying does not become excessive in relation to parodic
purpose merely because the portion taken was the original's
heart." Campbell, 510 U.S. at 588.   Accordingly, 3C's taking of
what could be considered the "heart" of Three's Company—the
roommates' living arrangement, basic personalities, location,
and the like—is not dispositive in analyzing the third factor.

    DLT's more convincing argument is that 3C copied many
minor elements of Three's Company, which had neither a parodic
purpose nor were necessary to evoke Three's Company.  (See
Defs.' Memo at 26.)   Those elements include, among others:
Chrissy/Connie being a minister's daughter; Jack/Brad is a chef-
in-training; Linda/Janet working in a flower shop, and so on.
3C even takes sequences from particular episodes of Three's
Company: the female roommates' mixing together unfinished wine
bottles the morning after their original roommate's going-away
party; Janet/Linda suggesting that Jack/Brad go see an "art-
house movie"; and various innuendo-laden dialogue between
Jack/Brad and Chrissy/Connie which lead other characters to
believe the two are sexually involved.  3C's copying of not only

Three's Company's heart, but also its metaphorical appendages, considered on its own, weighs against a finding of fair use.

But, as noted above, the third factor is not analyzed in a vacuum.  In articulating a standard for determining the amount a parody may copy from the original, the Supreme Court set a floor, not a ceiling: "When a parody takes aim at a particular original work, the parody must be able to 'conjure up' at least enough of the original to make the object of its critical wit recognizable."  Campbell, 510 U.S. at 588.  And that floor is considered in light of the first and fourth factors.  This Court has already established, under the first fair use factor, that 3C is a highly transformative parody of Three's Company.  (See supra III.B.1.)  That, coupled with the Court's estimation of the minimal effect of 3C on the market for or value of Three's Company (see infra III.B.4), renders the third fair use factor of comparatively lesser importance.

### 4. The Effect on the Potential Market for or Value of the Copyrighted Work

The final fair use factor examines the market harm caused by the alleged infringement, taking account "not only of harm to the original but also of harm to the market for derivative works."  Harper & Row, 471 U.S. at 568; see also, Castle Rock, 150 F.3d at 145.  This factor, of course, is

contingent on the first three and considered holistically along with them.

Once again, parody is afforded greater latitude vis-à-vis its adaptation of the original work.  According to the Supreme Court:

> We do not, of course, suggest that a parody may not harm the market at all, but when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act.  Because "parody may quite legitimately aim at garroting the original, destroying it commercially as well as artistically," B. Kaplan, An Unhurried View of Copyright 69 (1967), the role of the courts is to distinguish between "[b]iting criticism [that merely] suppresses demand [and] copyright infringement[, which] usurps it."  Fisher v. Dees, 794 F.2d at 438.

Campbell, 510 U.S. at 591-92.  This position reflects that there is no protectable derivative market for criticism by acknowledging the reality that, generally speaking, authors of original works rarely want their work to be criticized.  Id. Therefore "[t]he fact that a parody may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright that the like threat to the original market."  Id. at 593.

Here, DLT argues that 3C damages the potential market for Three's Company because it diminishes the novelty of, and the market for, a potential stage adaptation of Three's Company;

further, DLT claims that 3C fulfills the same demand as Three's
Company itself. (Defs.' Memo at 26-28.) DLT cites Salinger in
support of the former proposition (finding that an authorized
sequel of The Catcher in the Rye may undermine the potential
market for an authorized sequel), Salinger, 607 F.3d at 74, and
a review of 3C specifically referring to the play as "three's
company, too-oo!" (Defs.' Memo at 27; FAC Ex. B, Charles
Isherwood, Names Have Been Changed to Protect the Innuendoes,
N.Y. Times, June 24, 2012 ("Names Have Been Changed")) to bolster
the latter.

        Both arguments fail. The derivative work in Salinger
was meant to be a sequel of the original, which is not the case
here. And the same review which referenced 3C with a play on
words itself refers to 3C as deconstruction of the popular
television show (see Names Have Been Changed"). That theme is
picked up by another review of 3C, aptly titled "Review: 2 gals,
a guy and Chekhov in play '3C'," which observed:

> If a surreal, downbeat inversion of a cheery 1970's
> sitcom sounds intriguing, then you and your therapist
> will probably want to see ... "3C." Adjmi has
> imagined how Chekhov (and maybe Wile E. Coyote) would
> handle a classic American television situation comedy,
> based on the lighthearted "Three's Company." He's
> reworked the original fluffy good humor into deep
> dysthymia and near-suicidal depression, using
> absurdism and existentialism overdosed with Chekhovian
> angst.

(FAC Ex. B, Jennifer Farrar, 2 gals, a guy and Chekhov in play '3C', ASSOCIATED PRESS, June 21, 2012.)   Indeed, 3C appears to be intended for those who enjoy other of Adjmi's "hard-edged," (id.), plays; and the Court is quite sure that a viewing of Three's Company does not require one's therapist.   In light of the Court's review of 3C and Three's Company, and contemporary reviews of the production, 3C is not a potential market substitution for Three's Company.   Accordingly, there is no cognizable harm under the Copyright Act, and the fourth element weighs in favor of a finding of fair use.

IV.   CONCLUSION

        For the reasons set forth above, the Court requires no additional information to reach the conclusion that 3C is a fair use of Three's Company.  The play is a highly transformative parody of the television series that, although it appropriates a substantial amount of Three's Company, is a drastic departure from the original that poses little risk to the market for the original.  The most important consideration under the Section 107 analysis is the distinct nature of the works, which is patently obvious from the Court's viewing of Three's Company and review of the 3C screenplay—materials properly within the scope of information considered by the Court in deciding this motion on the pleadings.  Equating the two to each other as a thematic or stylistic matter is untenable; 3C is a fair use "sheep," not an "infringing goat."  See Campbell, 510 U.S. at 586.

        This finding under the statutory factors is confirmed and bolstered by taking into account aims of copyright, as the Court has done throughout.  That body of law is designed to foster creativity.  It does so by, in effect, managing monopolies in knowledge: granting one in original work to reward its creator, but ensuring it is limited, temporary, and does not operate as a moratorium on certain ideas.  The law is agnostic between creators and infringers, favoring only creativity and

55

the harvest of knowledge.  Here, "further protection against parody does little to promote creativity, but it places substantial inhibition upon the creativity of authors adept at using parody."  Warner Bros., Inc. v. Am. Broad. Cos., Inc., 720 F.2d 231, 242 (2d Cir. 1983).  Accordingly, Adjmi's Motion for Judgment on the Pleadings [dkt. no. 34] is GRANTED.  The Clerk of Court shall enter judgment accordingly.


SO ORDERED.

Dated:    New York, New York
          March 31, 2015

                              _Loretta A. Preska_
                              LORETTA A.  PRESKA
                              Chief United States District Judge